# THE DUPUY DE LOME.

## CHARENTE STEAMSHIP CO. v. THE DUPUY DE LOME.

### (District Court, E. D. Louisiana. March 28, 1893.)

### No. 10,957.

1. SALVAGE—COMPENSATION.

   The steamship D. broke her shaft during a heavy gale in the Gulf of Mexico at a point whence she was likely to drift on a dangerous coast. She was taken in tow by the steamship E., which occupied four days in bringing her to port, part of which time the sea was rough, and during which the E., in addition to the other perils consequent upon salving service, also incurred the danger of breaking the blades of her propeller. *Held*, that the E. should have as salvage one twelfth of the aggregate value of both ship and cargo.

2. SAME—DISTRIBUTION.

   The saving of the ship being attributable to the exposure and peril of the salving vessel and not of her crew, the sum awarded should be alloted, one sixth to the master and crew, to be apportioned among them according to their respective monthly wages, and five sixths to the vessel.

3. SAME—RIGHTS OF SHIPPER—EFFECT OF BILL OF LADING.

   A provision of a bill of lading for part of the cargo of the salving ship, that the ship might "tow and assist vessels in all situations * * * without the same being deemed a deviation," did not make the shipper a joint salvor to the extent of his interest in the cargo jeopardized. A shipper taking such a bill of lading would naturally look to insurance for protection, and cannot be deemed to have turned his contract of affreightment into a salvage expedition. As a consequence, the interest of such a shipper is not to be counted in arriving at the value of the cargo risked to effect the salvage. The Blaireau, 2 Cranch, 240, distinguished.

4. SAME—TOWAGE.
    The fact that the officers of the E. agreed to "tow" the D. to port did not change the character of the service rendered from salvage to that of towage.

5. SAME—COSTS.
    The fact that the libelant made no offer to arbitrate did not entitle the claimant to costs, there being no tender either of arbitration or payment for the libelant's services in the claimant's answer. The libelant should pay one twelfth, and the claimant eleven twelfths, of the costs.

In Admiralty. Libel by the Charente Steamship Company against the steamship Dupuy de Lome, her cargo and freight, to recover salvage. Decree for libelant.

J. McConnell & Son, for libelant.
Rouse & Grant for Rousseau, Latour & Co., intervening libelants.
Howe & Prentiss, for claimants.

BILLINGS, District Judge. This is a libel for salvage. On the morning of Sunday, March 22, 1892, the steamship Dupuy de Lome, on a voyage from Antwerp, via Havre, other ports, and Tampico, to New Orleans, became disabled by the breaking of her shaft. She was then in the Gulf of Mexico about 100 miles northeast from Tampico. On the evening of that day she was taken in tow by the libelant's steamer the Engineer, which was also bound for New Orleans. After the accident occurred the captain, who was confined to his bed, had a council of the officers, and a futile effort was made to turn the head of the De Lome westward. Then the sail was taken in. After a second consultation application was made to the steamship Engineer for aid. At the time the Engineer took the De Lome in tow a storm known as a "norther" was exerting its force, the wind blowing from N. N. E. The norther was of about three days' continuance, lasting during a portion of Monday. There was on Sunday a heavy head sea. The sea was agitated, though the waves had no crest, (houleuse.) The De Lome was brought, in charge of the Engineer, to the Southwest pass, where she arrived and was safely anchored on Thursday, the 26th of May. The value of the ship and cargo salved was as follows:

The S. S. Dupuy de Lome, say ......................................... $265,200
Her cargo ............................................................ 111,000
  "  freight .......................................................... 3,600
                                                                      ---------
    Total value salved ............................................... $379,800

The value of the salving ship and cargo was as follows:

S. S. Engineer ...................................................... $175,000
  "    cargo ......................................................... 68,000
                                                                      ---------
    Total value salving ship and cargo ............................. $243,000
From this must be deducted the portion of cargo covered by interveners' bill of lading, viz ......................................... 20,927.40
                                                                      ---------
    Leaving total value risked by salving ship at .................. $222,072.60

The salvage services continued for four days, and consisted of rescuing and bringing to port. The danger to the salved vessel

was that in a fierce wind with a rough sea she was comparatively helpless, and from the quarter of the wind was liable to drift towards a dangerous point upon the Mexican coast and there be stranded, or to founder in the open sea. The danger to the salving vessel was that which attends any vessel which, not made for drawing another vessel, is attempting to draw one by day and by night for the period of four days, during a portion of which time the vessels were in an ugly sea. There was another risk arising from the danger of fracture of the blades of the propeller of the Engineer. They were of cast iron, and this danger came from the liability of the iron chain, in case it should become slack, coming in contact with these cast-iron blades and breaking them, which, since they were of cast iron, was quite possible in such a sea, and during a four-days connection between the two vessels. If the blades had broken, the Engineer would have been also at the mercy of the elements in the Gulf of Mexico, which is a dangerous water.

The general principle as to quantum of salvage is thus given by Judge Peters in The La Belle Creole, 1 Pet. Adm. 42:

"It is not confined to a mere quantum meruerunt as to the person saving, but is expanded so as to comprehend a reward for the rescue of life and property, labor and danger in the undertaking, as well as a premium operating as an inducement to similar exertions."

It must be borne in mind that this is not a case of river or harbor salvage, but the case of a salving at sea, where the full force of the doctrine must be applied that the compensation must be a reward of such magnitude as to encourage similar efforts to save property situated far from a safe harbor, and where the danger is of total submerging or of being wrecked. Salvage hardly ever exceeds one half of the value of the property salved. This is in case of derelict property. From that rate it comes down to a small percentage or a sum in round numbers. Judge Conkling (speaking in 1857) in his treatise on Admiralty, at page 362, says:

"In cases other than derelict, and which are not characterized by very extraordinary features, the amount of salvage allowed may be said to have fluctuated between one eighth and one half, and it may be added that one third seems to have been the amount most frequently adjudged."

The reference in support of this statement is to Judge Story in The Emulous, 1 Sum. 207, 213, and the reports of cases determined in admiralty in England and in the United States, passim.

It seems to me that, considering the danger to the disabled ship and the protracted danger to the libelant's vessel, an award of one twelfth of the value salved would be just. The property salved amounted in value to $379,800. One twelfth of this would amount to $31,650. For this amount I think there should be a decree, with interest from judicial demand.

Next, as to the division of the salvage: As between the vessel and crew the ratio of salvage or its division depends largely upon whether the rescue was owing substantially to the efforts and peril of the men, or the exposure to danger of the ship. In this case I think it was to a large extent the latter, and that, when it is

considered that the ship was a steamship, as between the vessel and crew, five sixths of the salvage should go to the vessel, and one sixth to the crew, including the master; the one sixth to be apportioned among them according to their respective monthly wages.

As to the question whether the owner of the 737 packages of coffee constituting a portion of the cargo of the Engineer is entitled to share in the salvage: The claim of the freighter is placed upon the fact that the bill of lading contains this clause:

"The ship owners reserve to themselves liberty for the steamers to sail with or without pilots, to tow and assist vessels in all situations, to proceed to the ports stated in this bill of lading via any other port or ports, in any order or rotation, whether in or out of the customary or advertised route, without the same being deemed a deviation."

It is urged that this clause makes the case parallel to that of The Blaireau, 2 Cranch, 240, where the shipper, through his partner, being on board, assented to the deviation. It seems to me that the cases, when closely analyzed, are distinguishable. Whereas, in the case of The Blaireau, the freighter had, before the goods were laden, made his contract of affreightment, in accordance with which there could be no deviation without the ship being responsible for any loss resulting to his cargo therefrom, and afterwards, being on board during the voyage, consented to the stoppage and deviation for the purpose of rendering salvage services, he released the ship from an existing contract for which a consideration had been agreed, to wit, a specified freight, and, having no opportunity to insure, it was held to be the fair intendment of the parties that he should become a joint salvor and share ratably in the salvage. In this case the contract of affreightment contains the stipulation that the ship may assist vessels in distress, i. e. may render salvage service. The contract of carriage, by its original terms and vigor, exempted the ship from responsibility arising from deviation for salvage purposes. The consideration for the carriage was based upon, and the opportunity to obtain insurance afforded in accordance with, a contract of carriage containing this exemption. With such a stipulation in the bill of lading, do the freighter and the ship by fair intendment agree that, if salvage service is rendered, the cargo shall share in the salvage, or that, so far as relates to salvage, the cargo shall not be counted as risked by the master or the ship? Does this stipulation exempting the ship from responsibility imply an agreement that the shipper, in case of deviation for salvage, shall have his indemnity in a proportionate participation in the salvage or in insurance elsewhere? The question means this: Does the freighter become more than a shipper, and does he also embark in a salvage enterprise, and seek in that for the insurance which, without the exemption, the obligation of the vessel would have furnished, or does the shipper permit the salvage service, agree that the cargo should not be counted as risked by the vessel, and that he will look for his indemnity to other insurance? It seems to me the implied understanding between shipper and ship, when the bill of lading contains such a provision, must be

the latter. Judge Conkling, in his treatise on Admiralty, seems to make such a distinction, for at paragraph 367 he says:

"The freighter of the salvor ship is not entitled to salvage unless, being on board at the time of the salvage enterprise, he consented to it, and discharged the owner from the responsibility incurred by deviating from the voyage."

In the case of The Blaireau the implication was held to be that the shipper, being present on board, exempted the vessel that he might run his own risk and become a salvor. In this case the implication is that in advance of the voyage the shipper exempted the ship, not that he might become a salvor, but that he might pay freight accordingly, and seek his indemnity by other insurance. The clause in the bill of lading in question seems to be a commercial adoption pro tanto of the suggestion of Judge Peters in The Cato, 1 Pet. Adm. 65, where he says:

"It ought to be settled by the general consent of all merchants, in whatever capacity they find themselves, that these exertions to save life or property should incur no loss to the salvors."

I have thus far considered this question with reference to the natural inferences which follow from the circumstances of the case. The evidence shows that in this case such was the understanding, for the bill of lading shows that the coffee thus billed was insured for $24,000,—more than its full value, that being $20,927.40.

In support of the conclusion to which I have arrived is the fact that in England never has the cargo of the salving ship shared in the salvage, and The Blaireau is the solitary case in the courts of admiralty of the United States where such a participation has been allowed to any cargo owner. It does not appear how generally or how long bills of lading containing this reservation have been used, but it does appear that they are the ordinary bills of lading of this line of steamers, for this reservation is for all the steamers of the line. Justice Washington, in The Cora, 2 Wash. C. C. 86, says as follows:

"It is unreasonable to suppose that, in the multitude of cases which were cited at the bar, some of the saving vessels should not have had cargoes on freight; and yet in not one, except that of The Blaireau, does it appear that even the claim of a freighter was interposed. This is certainly strong evidence of the general understanding of legal and commercial men as to the rights of such a claimant."

Justice Story, in The Nathaniel Hooper, 3 Sum. 580, calls attention to the same fact, as follows:

"In the first place, although the case must be of frequent occurrence in suits for salvage, yet it does not appear that any such general claim has ever been allowed in practice or by courts of justice. The omission to make any such general claim, under such circumstances, cannot but be very significant, and expressive of the general sense of the community."

It seems to me, therefore, that the claim of the shipper of the coffee must be rejected, and his intervention dismissed. It follows, also, that, in the determination of the value of the cargo risked by the salving vessel with a view of fixing the rate or amount of sal-

vage, that portion of the cargo covered by the interveners' bill of lading must be excluded.

It is urged by the answer of the claimant that by agreement of the parties what was done was characterized as towage. Lieut. Laretsche, the officer of the De Lome who acted for that vessel, and the captain of the Engineer, who acted for the latter, do not differ as to what was said on this subject. It was that the Engineer should tow the De Lome to the mouth of the Mississippi river, and "as for payment the arbitrators will decide that on her arrival there." I do not think that this means anything more than that the Engineer should bring the De Lome. The words were not selected studiously, nor with a purpose to characterize legally the service. Salvage may be rendered by towage as well as by any other act.

It is further urged that there was no offer on the part of the libelant of arbitration, but that the suit was instituted immediately upon the arrival of the De Lome, or before any opportunity was given the claimant for settlement. But no tender either of arbitration or of money for the libelant's services was made in the claimant's answer. Strictly the salvor may retain possession of the salved property till he institutes his suit, and delivers it over to the admiralty court. On the whole, it seems to me that the ordinary rule as to costs should be observed, the libelant bearing one twelfth thereof, and the claimant eleven twelfths; the ordinary rule in salvage being that the costs are to be paid out of the property saved. The Nathaniel Hooper, 3 Sum. 542, 582.