ULSTER S. S. Co., Limited, v. CAPE FEAR TOWING & TRANSPORTATION CO. et al.

(Circuit Court of Appeals, Fifth Circuit. March 28, 1899.)

No. 744.

1. SALVAGE—SERVICES.

Services of tugs in towing a steamer from an offshore sand bar, on which she had grounded, in connection with their carrying out the steamer's anchors to enable her to assist in getting off the bar, are in the nature of salvage services, authorizing compensation on that basis.

2. SAME—COMPENSATION.

An allowance of $13,000 for salvage services in getting a steamer off a sand bar should be reduced 50 per cent., though the steamer was worth $300,000, the value of the tugs employed being only $18,000, all the services being rendered under the direction and control of the master of the steamer, the real services which put her afloat being, in the main, rendered by herself, operated by the master and crew, it appearing probable, the good weather continuing, that without the services of the tugs the master would have successfully floated her through the use of his own crew and appliances, no risk being incurred by the salvors, and the tugs being exposed to no danger, the skill shown in rendering the services being of the ordinary kind, the labor being the ordinary employment of the tugs and persons engaged, the time employed being less than a day, and it appearing that extraordinary awards were given by the decree to members of the crews of the tugs, such as $300 to cooks and firemen, who performed no services out of their usual routine, and whose wages were $1 a day.

3. SAME—ALLOWANCE TO CREWS.

Where salvage services which occupied less than a day are of the lowest order, and the crews of the tugs perform only services in the ordinary course of employment, the award to them should not be more than two months' pay.

Appeal from the District Court of the United States for the Eastern District of Louisiana.

On September 24, 1897, at 7:20 a. m., the British steamship Torr Head, bound on a voyage from New Orleans to Belfast, drawing about 25 feet of water astern, grounded on the Frying Pan Shoals off the coast of North Carolina, near the mouth of Cape Fear river, between five and six miles inside of the light-ship there stationed, and about a mile east-northeast from the black buoy. She had been swept out of her course about 40 miles by an abnormal setting of the Gulf Stream to the south and west, caused by a hurricane that had passed over the locality a day or two before. Frying Pan Shoals are described in the United States Coast Pilot as especially dangerous to navigation "on account of the great distance they make out from the shore," and "on account of their distance from the land, and the strong tidal currents which set across them in strong winds." They are said to consist "generally of sand,

shifting to some extent with every gale." At the time of this mishap the weather was fine, the barometer high, and the sea smooth. The weather remained fine, with light breezes, the whole of the 24th and 25th. The ship grounded without any noticeable shock. About three years before this, the ship Valedo, 310 feet long, drawing 21.6, grounded in the same way, and at about the same spot, and got off without assistance and without injury by turning herself around with her anchors. When the Torr Head grounded, soundings were immediately taken around the ship, and 30 feet of water was found over the stern, shoaling gradually to 25 feet amidships, 22.6 at the break of the forecastle, and 24 over the stem. The character of the bottom was examined, and found to be soft sand. There was deep water both ahead and astern of the ship. Attempt was made to back her off by filling the after water tanks, and shifting cargo from forward aft, so as to put the vessel by the stern, and by going astern with the engine; but this did not succeed. While these operations were going on, the steam tug Jacob Brandow, about 9:30 a. m., came alongside, and offered assistance, which was refused. About 11:30 a. m. the assistance of that tug was engaged, with the understanding that the amount of compensation to be paid was to be settled by arbitration; and the tug took a stern line to help pull the ship off. The captain of the Torr Head understood that he was employing them for a towage service. About 12.30 p. m. the tug Blanche arrived, with a salvage crew in a lifeboat, but the services of these salvors were refused, and the tug Blanche was engaged on the same terms as the Brandow to take a line and tow astern. About 3:30 p. m., while the Brandow and the Blanche were towing astern, a small steam tender, called the Isabel, came out, and offered her assistance, and she was engaged to run out the starboard anchor, but her captain considered his vessel too small for that service, and she was told to take a line, and tow astern with the other tugs. This towing astern by the three tugs continued until 5 p. m., with little or no result. The captain of the Torr Head then ordered the tugs to stop towing, and to go forward, and run the steamship's starboard anchor out, broad off on the starboard bow, which the tugs Brandow and Blanche proceeded to do, and about 6:30 p. m. got out the anchor and about 40 fathoms of chain. The three tugs were then set to towing on the starboard bow, and strain was put on the anchor by the ship's steam windlass. The result was that in an hour's time the ship was moved about 70 feet, and was turned almost entirely around: i. e. about 124 degrees, or from N. 56 E., to S. This brought the starboard anchor close under the forefoot of the ship. The captain of the Torr Head then, about 7:30 p. m., asked the tugs Blanche and Brandow to run the starboard anchor out straight ahead, in order that he might heave it tight, so as to keep the ship from moving further on shore, and so that he might jettison some molasses. This the tugs refused to do, and then quit work, saying they would come back the next tide. The captain says they gave as a reason for this refusal that the ship was all right, and in no danger. He testifies that he begged, and almost beseeched, them to run this anchor. They gave as their reason for this refusal that they thought it was an obstruction to the vessel in the position she was in. When the tugs quit work and left, the anchors were dropped under the forefoot of the vessel, and the crew was sent to supper. The tug Isabel lay near the ship. The tug Blanche went off a mile or two, and anchored. The tug Jacob Brandow went off towards Wilmington, with the lifeboat in tow, to take the occupants ashore. At 8:15 p. m., after supper, the crew began to jettison cargo,—staves and molasses,—which jettison continued until 10 p. m. At this time the tug Blanche came back, and offered the services of a pilot, which were refused. Soundings were made at dead low water, at 9:30 p. m., around the ship, and deep water was found ahead, and 21 feet amidships. About 11 p. m. the tug Blanche came back again, and, after some difficulty, and protests that she was not strong enough, was persuaded to run the anchor straight out ahead, with 30 fathoms of chain. In this work the Isabel helped her. The ship then heaved tight on this chain, and commenced to pump out her tanks to lighten the ship, and continued to jettison cargo. About 1 a. m. on the morning of the 25th the tug Brandow came back, and all the tugs were ordered straight

ahead to tow, the ship meanwhile working her engines, and putting a strain on the anchor chain. About 3:30 a. m. it was found that the ship was moving, and a heavy strain was put on the anchor chain. About 4 a. m. the anchor hove home, and the ship's head began to fall off to port. The tugs were then ordered to tow on the starboard bow. At 4:15 a. m. the ship began to move ahead. At 4:25 she was all afloat, and at 4:30 a. m. the ropes were cast off, and the ship proceeded on her way to Belfast, the captain saying to the tugs he would give them full credit for all they had done. While she was aground, she "lay easily," as one of the libelants admits.

It is claimed in the libels that she was in danger of being hogged, because she was aground amidships; but the testimony is that she was water-borne bow and stern all the time, and was never at any time in any such danger. It is further claimed that she was pounding. One of the witnesses for libelants says she pounded on the morning of the 25th, before she was hauled off, but that he was not aboard, and could not say how hard she pounded. Those who were aboard of her say she moved slightly and easily in her bed in the sand. When the Torr Head reached Belfast, she was docked, and the only injury she suffered from this grounding was the denting of five of her plates, which were taken out, rerolled, and put back in position. The small damage done, as thus indicated, to a ship of her enormous weight and length, shows the insignificance of the pounding. The cargo jettisoned was 10 tons of staves and 650 barrels of molasses, weighing about 200 tons. The Torr Head is 453 feet long, of 5,910 gross and 3,967 net tonnage. She is a twin-screw steel ship, launched in March, 1894, and cost, new, £80,000, and had been three years in service. Figuring her annual depreciation at 7 per cent., which is the lowest allowed, as the master testifies, it would make her value at that time about £63,200, or, in American money, $305,888. This is the only evidence in the record as to the value of this ship. The tug Jacob Brandow is a wooden vessel, built in 1874, and was therefore 23 years old at that time. She is 78 feet long, 17 feet beam, 8 feet depth, net tonnage 32.69 tons, with one boiler 14 feet long, 96 inches in diameter (allowance of steam 80 pounds per square inch), and one condensing engine of 22½ inches diameter of cylinder and 2 feet piston stroke. The evidence of her value is that libelants bought her for $5,200 more than two years before this time. She had on this occasion a crew of six men,—master, mate, engineer, fireman, cook, and deck hand. The tug Blanche is an iron vessel, built in 1878, and was therefore nineteen years old. She is 83 feet long, 17.9 feet beam, 10 feet depth, net tonnage 47.12 tons, with one boiler 11½ feet long and 107 inches in diameter (allowance, 75 pounds of steam to the square inch), and one condensing engine of 20 inches diameter of cylinder and 22 inches stroke of piston. The evidence of her value is that libelants had bought her three years prior to that date for $11,000. She had a crew of six, the same as the Jacob Brandow. The tug Isabel is a small, wooden vessel built at Buffalo, on Lake Erie, in 1891, and was therefore six years old at that time. Her certificate of inspection does not give her dimensions, but states that she is of 13.32 net tons burden, has one boiler 9 feet long, of 75 and 88 oval inches in diameter (steam allowance, 115 pounds per square inch), and one keel condensing engine of 14 inches diameter of cylinder and 16 inches stroke of piston. There was no evidence adduced as to her value. She had a crew of five persons,—master, mate, engineer, fireman, and cook. The value of the salved vessel, exclusive of cargo and freight, now involved in this suit, was therefore about $306,000, of the salving vessels about $18,000, and the number of persons on the vessels engaged in assisting the Torr Head 17. The Torr Head touched at 7:20 a. m. on September 24th, and went on her voyage 4:30 a. m. September 25th, being aground about 21 hours. The tugs worked during only a portion of this time. The Brandow worked from 11:30 a. m. to 7:30 p. m. on the 24th, being 8 hours on that day, and from 1 a. m. to 4:30 a. m. on the 25th, being 3½ hours on that day; or a total of 11½ hours. The Blanche worked from 12:30 p. m. to 7:30 a. m. on the 24th, and from 11 p. m. on the 24th to 4:30 a. m. on the 25th; a total of 12½ hours. The Isabel worked from 3:30 p. m. to 7:30 p. m. on the 24th, and from 11 p. m. on the 24th to 4:30 a. m. on the

25th, a total of 9½ hours. With the exception of the two occasions when the anchor was towed out, once by the Brandow and Blanche and once by the Blanche and Isabel, the work consisted of taking a line and tugging at the Torr Head. All of this work was done in fine weather and smooth sea, and without damage or particular risk of person or property. The business of these boats was to seek towage in the waters where they were working on the Torr Head, and further out, and all up and down the coast for 40 miles, and both boats and crew were engaged in their ordinary vocations during the whole time of this service. These facts appear clearly in the contest made in this court between the crews and the owners of these vessels as to the division of the award between them. None of the crews of the tugs at any time left their own vessels, or went on board the Torr Head, except that two men paddled around the Torr Head in a small dory, and took soundings. The tugs at all times were acting under the orders and directions of the master of the Torr Head, who had sole charge and direction of the services rendered. The two tugs Brandow and Blanche belong to the same owners, the Cape Fear Towing & Transportation Company. The tug Isabel is owned by John L. Grim. The owners of these tugs filed separate libels in rem for salvage against the Torr Head when she returned to the United States in November, 1897, claiming in this proceeding salvage not only on the vessel, but also on her cargo and freight. Six of the crew of these vessels—two from each—also filed a separate libel in rem, making similar claim. All three libels were consolidated.

It is conceded that no claim can be made in this present cause for salvage on either the pending freight or the cargo. The district court found that the services rendered were of the nature of salvage services, and made an award of $13,000, to be divided equally between the crews and the owners of the three tugs. The decree of distribution shows as follows:

Amount awarded herein, thirteen thousand dollars.................................$13,000 00

To the Cape Fear Towing & Transportation Company, owner of the salving tugs Blanche and Jacob Brandow, and to John L. Grim, owner of the salving tug Isabel, one-half of said sum, to wit, the sum of............... ....$ 6,500 00
—Two-thirds thereof to go to the Cape Fear Towing & Transportation Co., and one-third to John L. Grim. To T. Jeff Smith, William (Dock) Davis, C. B. St. George, Sam Betts, Jno. Risley, George Penny, and Elijah Burruss, members of the crews of said tugs Blanche, Jacob Brandow, and Isabel, who have claimed salvage herein, seven-seventeenths ($7/17$) of the remaining half, $7/17$ of $3,500.00 being the sum of............................................ 2,676 47
To the Cape Fear Towing & Transportation Co. and John L. Grim, owners as aforesaid, the remainder of said sum of $6,500.00, to wit, $10/17$ of $6,500.00, being the sum of............ ..... ....................................... 3,823 53
—To be divided ⅔ and ⅓ as aforesaid. _____
  Total award of salvage... . ........................................................$13,000 00

The said sum of $2,676.47 awarded to the crew, as afore stated, to be divided among them in proportion to their wages, respectively, as follows:

| Name. | Rank. | | Wages. | To Receive. |
|---|---|---|---|---|
| T. Jeff Smith | Engineer, | Tug Blanche | $2 25 | $694 57 |
| Wm. (Dock) Davis | Fireman, | Tug Blanche | 1 00 | 308 70 |
| C. B. St. George | Mate, | Tug Jacob Brandow | 1 17 | 361 20 |
| Sam Betts | Deck hand, | Tug Jacob Brandow | 25 | 77 20 |
| Jno. Risley | Engineer, | Tug Isabel | 2 00 | 617 40 |
| George Penny | Fireman, | Tug Isabel | 1 00 | 308 70 |
| Elijah Burruss | Cook, | Tug Isabel | 1 00 | 308 70 |
| Total to crews................................................................$2,676 47 | | | | |

The claimants have appealed against the award, assigning as error: (1) "That the court erred in holding that the services herein were salvage services. (2) That the court erred in fixing the value of the services performed

by the libelants at thirteen thousand dollars, said sum being more than double the amount that should have been allowed in this cause." The owners of the tugs have taken a cross appeal, assigning as error "that the court erred in the division of the amount of salvage awarded, to wit, in only one-half of said award (to wit, one-half of thirteen thousand dollars) to your petitioners said Cape Fear Towing and Transportation Company and said John L. Grim, instead of decreeing to your petitioners the whole of said amount, except a mere nominal sum to the crews of said tugs engaged in the salvage service rendered, as the services rendered by them were merely in the nature of their employment."

E. H. Farrar, E. B. Kruttschnitt, B. F. Jonas, and Hewes T. Gurley, for appellant.

Richard De Gray, Thos. Evans, John D. Grace, J. W. Carroll, and Chas. Carroll, for appellees.

Before PARDEE and McCORMICK, Circuit Judges, and PARLANGE, District Judge.

After stating the case as above, the opinion of the court was delivered by PARDEE, Circuit Judge.

The ordinary and usual employment of the tugs, for which salvage services are claimed in this case, was in the rendition of towage services in the same waters where the Torr Head was aground. Under the facts, it is fair to presume that the original employment of the tugs by the master of the Torr Head was really to render towage services, for which compensation was to be made whether they successfully aided the Torr Head in getting afloat or not. This appears from the undisputed evidence of the master, who employed the libelants, and agreed to fix their compensation by arbitration. It also appears to have been the idea of the master of the tugs, because, of their own motion, and against the wishes of the master of the Torr Head, they quit work at 7:30 p. m. on the first day of employment, and the tug Jacob Brandow entered into other employment. The services of salvors, to entitle them to compensation as such, must be successful, and, as a general rule, and necessarily, they must be continuous. In this connection it is significant to note that the assignment of error by the libelant owners of the tugs in their cross appeal, in which they claim that the crew should be awarded only a nominal sum, is to the effect that the services of the crews were merely the ordinary services rendered by them under their employment. The district court found that the services rendered by the libelants were in the nature of salvage services entitling the libelants to compensation. Looking at the services actually rendered, all were within the usual employment of the tugs and their crews. The only peculiar salvage service rendered was in the carrying out of the anchors of the Torr Head, and, considering this valuable service, in connection with the towage, the finding of the district court that the services were in the nature of salvage services, entitling the libelants to compensation, is not erroneous. We think it proper to emphasize the fact that all the services rendered and performed were under the direction and control of the master of the Torr Head, and that the

real services which put the Torr Head afloat were, in the main, rendered by the Torr Head herself, operated by her master and crew.

The real contention before us is in regard to the matter of compensation. The district court allowed $13,000, and directed its disposition, half to the owners of the tugs and half to the crews of the respective tugs. The argument is pressed in this court that the amount awarded in a salvage case is so largely within the discretion of the district court that it is not to be disturbed, except for gross overallowance, palpable mistake, and the like. The true rule appears to be as stated in The Connemara, 108 U. S. 359, 2 Sup. Ct. 754, as follows:

"In The Sybil, 4 Wheat. 98, Chief Justice Marshall said: 'It is almost impossible that different minds contemplating the same subject should not form different conclusions as to the amount of salvage to be decreed, and the mode of distribution.' And by the uniform course of decision in this court during the period in which it had full jurisdiction to reverse decrees in admiralty upon both facts and law, as well as in the judicial committee of the privy council of England, exercising a like jurisdiction, the amount decreed below was never reduced, unless for some violation of just principles, or for clear and palpable mistake or gross overallowance. Hobart v. Drogan, 10 Pet. 108, 119; The Camanche, 8 Wall. 448, 479; The Neptune, 12 Moore, P. C. 346; The Carrier Dove, 2 Moore, P. C. (N. S.) 243, Brown & L. 113; The Fusilier, 3 Moore, P. C. (N. S.) 51, Brown & L. 341."

Many cases have been cited on one side to show that, compared with allowances made for salvage services in many cases of more or less similar circumstances, the amount allowed in this case was moderate and reasonable; and, on the other hand, to show that the amount allowed was very high, and out of all proportion to the services rendered. It is profitless to discuss these cases, as confusion could only come from trying to apply them in the present case. The Hesper, 18 Fed. 696, is, however, a case in which the circumstances are so similar that it is well to refer to it. The Hesper, worth $106,500, ran aground in the sand on Galveston Island, about 20-odd miles off the port of Galveston, and remained aground for three days; one-third of her cargo was lightered by tugs, which were worth $35,000; the weather was good; and the court found that:

"The Hesper, when aground as aforesaid, was in a condition of peril and distress, hardly likely to be able to get out of danger by her own efforts, even if the weather had been certain to continue favorable for many days, and certain to be wrecked if the weather should prove to be bad; that the services rendered by the Hesper by the libelants' boats were salvage services, but of the lowest grade, involving neither risk of property, peril of life or limb, or unusual exposure, or gallantry, courage, or heroism, and the same will be fully compensated by double compensation on the basis of towage and lighterage services."

In that case the district court allowed the sum of $8,000 salvage. This amount was cut down by the circuit court on appeal to the sum of $4,200; that sum being double compensation for towage and lighterage. In the instant case, we find that the Torr Head was aground in a condition of peril and distress for less than one full day; that the services rendered by the libelants' boats were salvage services, but of the lowest grade, involving neither risk of property, peril of

life or limb, nor unusual exposure, nor gallantry, courage, nor heroism. The elements to be generally considered in determining the amount of salvage in a given case, taken from instructions issued by the British Board of Trade, may be stated as follows: (1) The degree of danger from which the lives or property are rescued; (2) the value of the property saved; (3) the risk incurred by the salvors; (4) the value of the property employed by the salvors in the enterprise, and the danger to which it is exposed; (5) the skill shown in rendering the services; (6) the time and labor occupied. In the case of the Torr Head the value of the property saved seems to be large; the danger from which it was rescued was certain, but not determined; there was no risk incurred by the salvors; the value of the property employed was comparatively small, and it was exposed to no danger; the skill shown in rendering the services was of the ordinary kind; the time employed was short, and the labor was the ordinary employment of the tugs and persons engaged. Considering these facts, and that the amount of the salvage awarded was more than two-thirds of the value of the vessels employed in the service, and that under the decree appealed from extraordinary awards are given to the members of the crews of the libelants' vessels,—such as over $300 to cooks and firemen who performed no services out of their usual routine, and whose wages were a dollar a day,—it would seem that the allowance of salvage is out of proportion to the services rendered, and unduly high in reference to the objects for which salvage compensation is allowed. In addition to this, we think it apparent from the record that the allowance of salvage was made largely on the theory that the libelants' tugs and their crews really performed the whole services of saving the Torr Head from impending peril, while the fact is, as clearly appears from the evidence, and hereinbefore referred to, the real services which put the Torr Head afloat were rendered by the master and crew of the Torr Head, using her machinery and appliances; and it seems probable,—extremely probable,—the good weather continuing, that without the services of the libelants' tugs the energetic master of the Torr Head would have successfully floated his vessel through the use of his own crew and appliances.

While it is now conceded that no claim can be made in the present cause for salvage on either the pending freight or cargo, it is admitted that since the appeal was taken the libelants have sued in personam the owners of the Torr Head to recover salvage on both freight and cargo. As the trial judge filed no opinion in the case, we are not advised whether, in making his allowance for salvage, he considered the value of the cargo and freight. On the whole case we conclude that the allowance made against the Torr Head is an overallowance, that it was made on the incorrect theory that the libelants rendered all the services which saved the Torr Head; and that it ought to be reduced at least 50 per cent. On the cross appeal brought by the owners of the tugs it is claimed that the crews on board the libelants' tugs rendered only services within the scope of their employment, and that the amount allowed to the crews is wholly disproportioned to the services rendered. That this claim is well founded appears from

an inspection of the decree of distribution wherein cooks and firemen under pay of one dollar per day, and who rendered no services off their own tugs, and were in no wise overworked or exposed, are given nearly a year's pay as a reward, where they were occupied at regular hours in usual work, in a salvage venture over which they had no control.

Proctors argue and cite cases as though there was some fixed rule for distributing salvage compensation between vessels and their crews. Awards in all cases that have come to our notice have been based upon the particular circumstances attendant upon each case, and have varied from one-half the entire salvage awarded to one or two months' pay. In the instant case, as we have found substantially that the salvage services were of the lowest grade, and that the crews aboard of the respective tugs performed only services in the ordinary course of employment, an award of two months' pay would be ample. More than that would be judicial liberality at the expense of the unfortunate.

The decree of the district court is reversed and the cause is remanded, with instructions to award the libelants the gross sum of $6,500 salvage compensation, and distribute the same according to the views expressed in this opinion.