## THE NEW CAMELIA.

(Circuit Court of Appeals, Fifth Circuit. December 18, 1900.)

No. 970.

1. SALVAGE—AMOUNT OF AWARD—REVIEW.

An award of an admiralty court for salvage services in towing a disabled vessel into port, based on the value of the vessel salved, and which is many times the value of the towage, on which the award should have been based under the facts shown, is one made upon incorrect principles, and may properly be reviewed, and the amount reduced, by the circuit court of appeals.

2. SAME—AMOUNT OF AWARD—SERVICES OF CREW.

The New Camelia, a steamer worth $35,000, and having on board 150 passengers, broke her shaft when about the middle of Lake Pontchartrain, and was wholly disabled from further navigation. She was anchored, and a boat sent to a port 12 miles distant for a tug. Shortly afterwards a tug was sighted and signaled, and under direction of her owner, who was on board, such tug dropped her tow and proceeded to the steamer. On learning the facts the owner of the tug offered to tow the steamer to a port, which offer was accepted. The service required about two hours, after which the tug went back, and, securing her tow, proceeded on her way. It was in the daytime, and the lake was calm. No compensation was agreed upon, and the owner of the tug made no charge for salvage, but estimated the value of the towage service rendered at from $15 to $30. Subsequently members of the crew of the tug libeled the steamer for salvage services, and the court fixed the value of such services at 5 per cent. of the value of the vessel, amounting to $1,750, and apportioned one-half to the crew of the tug, which was equal to about three months' wages. *Held* that, while the services rendered might properly be considered salvage services, they were not of such an order of merit on the part of the crew, who were not volunteers, as to justify the award made them, but that, the vessel not having been in great peril, and the service having been offered and accepted merely as a towage service, and so regarded by the owner of the tug, the total award should not exceed double the value of such service as estimated by him, one-third to be apportioned to the crew.[1]

Appeal from the District Court of the United States for the Eastern District of Louisiana.

The steamer New Camelia, worth the sum of $35,000, a merchant vessel of the United States, licensed and enrolled in the coasting trade, proceeded on a voyage on Sunday, June 18, 1899, from Milneburg on Lake Pontchartrain to other points and places on and across said lake and on the Tchefuncta river. On this occasion she carried upwards of 150 passengers. About midway of said lake she broke her shaft, and was thereby disabled. This steamer is provided with side wheels, and both wheels are operated by one shaft: hence the breaking of this shaft rendered her propelling power useless. She

[1] Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.

has no mast or sail power of any kind. The vessel was anchored, and the master sent off one of the steamer's small boats, manned by her steersman and three of her four deck hands, to West End, something like 12 miles distant, to procure the assistance of a tug. Some time thereafter smoke was seen on the horizon in a northwesterly direction. Thereupon the master of the steamer New Camelia directed the mate to run the ensign up and down,—dip it several times,—to attract the attention of the descried vessel. The vessel sighted, and for which the signal was given, proved to be the tug Claribel, from the Tchefuncta river, bound for New Orleans, with two sand barges in tow; and her master, seeing the signal made on board the steamer New Camelia, called the attention thereto of Mr. Fritz Jahncke, who was and is president of the corporation owning and operating the steamer Claribel and a large number of other vessels on Lake Pontchartrain, and who thereupon directed the master of the Claribel to cast adrift their tow and proceed to the New Camelia. At this time the Claribel was so far distant that the flag signal could be seen only by the use of marine glasses, and the barges in tow of the Claribel could not be seen at all by the steamer New Camelia. Upon arriving off the steamer New Camelia, Mr. Jahncke was informed that her shaft was broken, whereupon he volunteered the services of the Claribel to take the New Camelia either to Madisonville, on the north shore of the lake, or to Milneburg, on the south shore, and point of her departure. This offer was readily accepted by the master of the steamer New Camelia, with a request to be taken back to Milneburg. Nothing whatever was said about compensation. After some two hours' continuous service, the tug Claribel landed the steamer New Camelia at Milneburg in safety, and the tug proceeded out upon the lake in search of her abandoned tow, which was secured in about the same locality as where abandoned, except that it had drifted some toward the north or Madisonville shore, and was brought on to New Orleans. During all this time the lake was calm, the weather settled,—in no wise threatening. The owner of the tug Claribel makes no claim for salvage compensation, and in regard to value and compensation for the services testifies as follows: "Q. In other words, if you had made a charge for this service, what would you have charged for this two hours' towage service? A. I would say, in towing barges from Covington to New Orleans— Q. What distance is that? A. About 35 miles. I have received $15 for it. Q. And how long does that require? A. That requires about eight hours. Q. Now, go on and make any further explanation you desire. A. I would consider that this service rendered to be worth about $15. I fix it at that price to receive coal for it. In fact, I did not want any money at all (at least, I told him that) for the services we rendered, and only expected that he should coal up the boat once, which would take from three to four tons of coal. Q. What did he do? A. He didn't do that yet, because I never called upon him, but he is willing to do it whenever called on. I will modify that testimony in regard to that $15. I will say that I have or had a yearly contract for towing all barges for the brickyard on the Tchefuncta river to West End and Spanish Fort for $15, one trip. I wouldn't make one single trip for that. I generally carry two or sometimes three barges. I receive for each barge $15." Some three months after the services were rendered, John Clark, engineer, William H. Fleming, fireman, Edward O. McCormick, fireman, and Robert Clayton, cook, of the tug Claribel, filed the present libel to recover salvage for themselves and all others entitled. After the taking of considerable evidence, the court below entered a decree in favor of the libelants, and gave the following reasons for judgment: "This is a libel for salvage brought by some of the crew of the tug Claribel for saving the steamboat New Camelia, valued at $35,000. The New Camelia broke her shaft near the middle of Lake Pontchartrain in June, 1899. She had on board 150 passengers, including many women and children. She had no sails nor other means of navigation, and the break was such as could not be readily or promptly mended. There was no immediate danger from the weather to the boat, and none whatever to the tug that saved her or its crew. The suggestion made in the testimony that the steamer, with its passengers, could have in time drifted ashore by the wind, the court thinks,

is not reasonable. Nor is the allegation that they could have been taken ashore in the small boats. The number of said boats were not sufficient, and the distance was too great. The court finds, as a matter of fact, that Lake Pontchartrain is at times a dangerous water, sudden squalls being more or less common, and that the New Camelia was in distress. Inducements to tugs to go in the aid of disabled passenger boats in distress should not be doubtful. The court will award such sum for the salvage service as in its opinion will stimulate all parties at all times to aid any passenger vessel in distress, and yet, in view of the value of the saved property and the lives thereon, should not be considered large. The court awards 5 per cent. of the value of said boat ($1,750) for salvage,—one half to the tug Claribel, and the other half to the crew of said tug." A decree entered in accordance therewith was followed by a decree of distribution awarding John Clark, engineer, whose wages were $75 per month, the sum of $243; William H. Fleming, fireman, whose wages were $40 per month, the sum of $129.65; Edward O. McCormick, fireman, whose wages were $40 per month, the sum of $129.65, and Robert Clayton, cook, whose wages were $35 per month, the sum of $113.45. From these decrees the claimants appeal, assigning errors as follows: "(1) That the court erred in holding that the services referred to in the libel herein filed were salvage services, and not towage services. (2) That the said services were rendered at the instance and under the orders of the owner of the tug Claribel, who was on board of said tug at the time, and who fixed fifteen dollars as a reasonable compensation—a proper charge—for the towage service rendered by his said tug Claribel, and that in consequence thereof the court erred in not dismissing the libel. (3) That the court erred in allowing any salvage whatever herein, the steamer New Camelia being in no danger or peril whatever at the time the services were alleged to have been rendered; being as safe as if she had been tied up at the docks or upon the banks of the Mississippi river. (4) That libelants performed no voluntary service, nor did any extra work or labor, on the day the alleged services were rendered; that they simply on that day discharged their usual and customary duties under the orders of the owner of the tug Claribel; that they were at no time in any danger or peril; and that the court erred in allowing them salvage herein. (5) That libelants performed no salvage services whatever, and that the court erred in not entering a decree in favor of Charles G. Coyle, claimant and owner of the steamer New Camelia. (6) That if the libelants should be decreed entitled to extra compensation for the alleged services, and only in that event, then we say that there is error in the decree entered herein against defendants. The amount, being grossly excessive, should be reduced to a reasonable and proper sum. (7) That the decree herein in favor of libelants is otherwise erroneous and contrary to the law and evidence."

Horace E. Upton, for appellant.

John D. Grace, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge (after stating the facts). Considering the condition of the weather on the lake at the time the accident happened to the New Camelia, and that she was within the reach of the assistance required to return to her landing, it would be extravagant to say that the New Camelia at the time was in imminent peril or in a helpless condition. All that she wanted was towage service, and the record shows that that service was furnished without delay by the owner of the tug Claribel, who was on board his tug and personally directing its operations. As to whether that service should be furnished, the libelants in the present case had nothing to say, and nothing to do, except to remain aboard their own boat and perform their

usual duties, for which they were regularly compensated. Notwith-standing all this, there is much authority to hold that the New Camelia, when in the open lake, with her shaft broken, her propeller power disabled, was so far disabled as to need assistance, and, although not in immediate peril, was so in distress as to justify the use of the word "salvage" in designating the aid she required. See The Dupuy de Lome (D. C.) 55 Fed. 93. And we are constrained to sustain the court a qua in holding that the services rendered by the tug Claribel to the New Camelia were salvage services; but we must insist that they were of the lowest order of salvage services, and to be compensated on the basis of work and labor. In Ulster S. S. Co. v. Cape Fear Towing & Transportation Co., 94 Fed. 214, 36 C. C. A. 201, we quoted and followed The Connemara, 108 U. S. 359, 2 Sup. Ct. 754, 27 L. Ed. 751, as to the true rule to be followed by this court, on appeal, in inquiring into the propriety of the amount awarded in the lower court in a salvage case, as follows:

"In The Sybil, 4 Wheat. 98, 4 L. Ed. 522, Chief Justice Marshall said: 'It is almost impossible that different minds contemplating the same subject should not form different conclusions as to the amount of salvage to be decreed, and the mode of distribution.' And by the uniform course of decision in this court during the period in which it had full jurisdiction to reverse decrees in admiralty upon both facts and law, as well as in the judicial committee of the privy council of England, exercising a like jurisdiction, the amount decreed below was never reduced, unless for some violation of just principles, or for clear and palpable mistake or gross overallowance. Hobart v. Drogan, 10 Pet. 108, 119, 9 L. Ed. 363; The Comanche, 8 Wall. 448, 479, 19 L. Ed. 397; The Neptune, 12 Moore, P. C. 346; The Carrier Dove, 2 Moore, P. C. (N. S.) 243, Brown & L. 113; The Fusilier, 3 Moore, P. C. (N. S.) 51, Brown & L. 341."

The rule declared has been much pressed on us in argument in this case, and it seems to be about the only ground upon which the libelants can maintain the large award given by the lower court. It is further impressed upon us with ingenuity and pertinacity that the New Camelia was in dire peril, without much chance of rescue, and that the allowance, although based on the value of the New Camelia, is small compared to the value of the New Camelia and the very valuable lives that were aboard of her. We are clear, however, that the New Camelia was not in great peril; that the services rendered by the Claribel were simple towage services,—asked for as towage services, received as towage services. And we are of opinion that the lower court, in determining the amount of salvage to be awarded, ignored some of the important principles to be considered in every salvage allowance, and considered mainly the value of the New Camelia, and the propriety, if not the necessity, of rewarding libelants, who could not be said to have volunteered, and who only incidentally rendered slight services in salving the New Camelia, so as to encourage future salvors. In our opinion, consideration should have been given to the character of the services rendered, as well as the value of the salved vessel; and, considering all the elements which should enter into the allowance for salvage, we are of opinion that in this case the compensation allowed

should be mainly on the basis of the towage services actually rendered, and any large allowance would be judicial liberality at the expense of suffering owners, not in fault, and already burdened by the accident to their vessel. A glance at the decree of distribution, as found in the record, shows that firemen and cooks, who actually did nothing in determining whether the service should be rendered, and nothing in rendering the same, save following their regular, ordinary daily work, are given over three months' extra pay. Their merit consists in being present while the tug on which they were employed rendered nearly two hours' towage services. We are not unmindful of the proposition urged in this and like cases that public policy requires generous rewards to be paid to salvors, to encourage and stimulate all parties at hand to aid vessels in distress, and in proper cases we have given it due effect. But in the instant case it is difficult to see how the giving of a large reward to the present libelants, who had so little to do with the salvage services rendered to the New Camelia, can be justified on grounds of public policy. Salvage services are volunteer services. The libelants herein may have been willing, but they were not volunteers. Salvage services must be meritorious. The services of the Claribel rendered to the New Camelia were meritorious. If the libelants had been volunteers on the Claribel to enable her to render the services, their services could well be classed as meritorious. As, however, they were regularly paid employés on the Claribel, were not volunteers, and performed no services beyond their ordinary duty, the merit was too remote to justify any considerable reward. The salvage law must be construed and applied with regard to the rights of property. A vessel that is so unfortunate as to break its shaft, lose its propelling power, thus putting its owners to delay and expense, ought not to be mulcted with large compensation to alleged rescuers who have been minor factors in rendering assistance. The right of the individual mariner to participate in the salvage compensation earned by his ship has been recognized from an early day, and is based on the proposition that in cases of salvage on the high seas, generally attended with risks to the salving vessel, individual effort and individual risk, voluntarily rendered and assumed, attend and aid the enterprise. And, notwithstanding the substitution of steam vessels for sailing vessels, the consequent changes in the abilities of ships to render salvage services and in the duties of mariners, the rule is still recognized and generally applied in every salvage case. The rule— not a hard and fast rule (see The Key West [C. C.] 11 Fed. 911)—now generally applied in this circuit is to give two-thirds to the owners, and one-third to the master and crew, and among the latter distinguishing in proper cases. With hesitancy, we apply this rule in this case. The enlightened owner of the Claribel, for the ordinary services rendered by his tug to the New Camelia when she was in distress, made and makes no claim for salvage. If he were before the court, we could see our way clear to reward him for the services he controlled, and furnished with a suitable bonus in addition to the actual value of the services rendered. To make a large allowance to the present libelants seems to verge on judicial liberality, and to be an un-

necessary and an uncalled-for hardship imposed on the owners of the New Camelia, not authorized by the facts and circumstances of the case, and would be based on the distress of the vessel, rather than on the services rendered. The distress and peril of the ship is the salvors' opportunity; but, as we have said above, the salvors' services must be volunteer, clear, and meritorious. Taking Mr. Jahncke's evidence most favorably to the libelants, and, considering that the towing of the New Camelia was equal to the towing of two barges, the towage services rendered the New Camelia were worth about $30. If doubled to include salvage reward, as is usual in salvage cases where the services are of a low order, the entire salvage services rendered the New Camelia would be fully compensated by an allowance of $60. That is the total sum for salvage which we think can be allowed in this case. The decree of the district court is reversed, and the cause is remanded, with instructions to enter a decree in favor of the libelants, fixing the sum of $60 as the total amount of salvage for the New Camelia, and awarding one-third thereof to the crew of the Claribel, and distributing to the libelants their proportion thereof, based upon their monthly wages.