## THE MANAGUA.

(District Court, S. D. Alabama. June 29, 1903.)

1. SALVAGE—PAYMENT TO OWNERS OF SALVING VESSEL—CLAIMS OF MASTER AND CREW.

Where the owners of a tug, authorized to represent the master and crew in the matter, made a settlement and received payment in full for salvage services rendered by the tug in floating a steamship which was on shore and in distress, such payment inured to the benefit of all persons interested as salvors, and the master and crew of the tug cannot maintain a suit against the steamship to recover an additional amount on the refusal of the tug owners to pay them a share of the sum received.

In Admiralty. Suit in rem for salvage services.

Gregory L. & H. T. Smith, for libelants.

Pillans, Hanaw & Pillans, for claimant.

TOULMIN, District Judge. The libelants are the master and crew of the tug Nimrod. The Mobile Tow Boat Association are the owners of the tug. On February 3, 1903, the steamship Managua was beached in the Gulf of Mexico, a short distance outside of Mobile Bay. On the evening of that day the tug Nimrod was in the bay, and, learning of the misfortune of the Managua, came within communication of her master, who sought to secure the aid of the Nimrod to get his vessel off the beach. The master of the Nimrod suggested to him to see her owners and make an arrangement with them for her services. Acting on the suggestion, the master of the Managua got aboard the Nimrod, and that night came to Mobile, some 30 miles distant, saw her owners, and made an agreement with them to pull his vessel off the beach. No specific amount of compensation was agreed on, but it was agreed between the parties that the amount of compensation should be left to arbitration after the services were rendered. Next morning the Nimrod went to the Managua, and found her on the beach in a condition of distress and some peril. About 9 o'clock in the morning the crew of the Managua brought the tow line to the Nimrod, and she towed or pulled the Managua off the beach, the latter at the same time using her steam and steering power. The Nimrod was engaged in this service from 40 to 50 minutes. The two vessels were of about the same value— from $20,000.00 to $25,000.00 each.

The Managua came at once to Mobile, and remained here several months. After she reached Mobile, and the matter of compensation came up for settlement, her master refused to submit it to arbitration,

although insisted on by the owners of the Nimrod. Some negotiations ensued between the parties, which resulted in the master of the Managua offering to pay $3,750 for the services rendered. This amount was accepted by the owners of the Nimrod, and a receipt given therefor in the following words and figures:

"Mobile, Ala., April 1st, 1903.

"S. S. Managua and Owners, to Mobile Tow Boat Association, Dr.

"Febry. 3. To services rendered in floating vessel ashore in Gulf of Mexico ten miles east of Sand Island.................... $3,750.00

"Recd. Paymt.           Harry T. Hartwell, for Owners of Tug Nimrod.

"Triplicate."

The crew of the Nimrod have received no part of the money received by her owners, and they bring this suit against the Managua for their compensation for salvage services.

I find that the services rendered by the Nimrod were salvage services, "but of the lowest grade, involving neither risk of property, peril of life or limb, nor unusual exposure, nor gallantry, courage, nor heroism." Ulster S. S. Co. v. Cape Fear T. & T. Co., 94 Fed. 214, 36 C. C. A. 201. I find that the Managua paid to the owners of the Nimrod large and full compensation for the services rendered. It unmistakably appears that the money was in payment of the services as salvage. It was for services rendered in floating the Managua, which was ashore and in distress. There was nothing in the settlement indicating any intention to limit the claim to that part of the compensation due to the owners of the Nimrod as separate claimants for salvage. It is clear that the payment was for the entire service.

If the money was paid to and received by Hartwell for the owners as salvage compensation for the entire service, it would necessarily import its receipt for the benefit of all other co-salvors interested in the same service. Roff v. Wass, 2 Sawy. 538, Fed. Cas. No. 12,000; Studley v. Baker, 2 Low. 205, Fed. Cas. No. 13,559. "The receipt by the owner or master of a vessel of the whole compensation awarded as salvage would necessarily import its receipt for the benefit of all other co-salvors interested in the same service, and so exonerate the owners of the vessel, to which the service was rendered, from any liability to others of the saving crew." McConnochin v. Kerr (C. C.) 15 Fed. 545. "It is clear, both upon reason and authority, that the master of a salvage vessel, in adjusting and receiving compensation for salvage service, is acting as agent for the owners and crew, and is responsible to them for their respective shares thereof; and where, as in this case, it happens that the compensation is received by the owners of the salving ship in the first instance, the result is the same —they are liable to the crew for their respective portions of the amount received." Roff v. Wass, supra; The Centurion, Ware, 477. Moreover, the evidence in this case satisfies me that the crew authorized and expected Hartwell, who represented the owners of the Nimrod, in the adjustment and settlement of the salvage compensation, to look after their interest in the matter of salvage. It shows that Clark, the master, and Hunnerwell, the engineer, of the Nimrod, together had an interview with Hartwell in regard to their getting

salvage, and that Clark alone had several interviews with him about the matter pending the negotiations for the settlement of the salvage, inquiring as to its progress, and soliciting him to look out for the interest of the crew. Clark testified that he first spoke to Hartwell about their getting salvage a few days after they pulled the Managua off the beach, and asked him to look out for their interest, and that Hartwell told him he would do the best he could for them. It does not appear that any member of the crew other than Clark and Hunnerwell had any direct communication with Hartwell on the subject, but it does appear from the evidence that the crew were all looking to Clark to attend to the business for them, and had requested him to do so, and that he in turn looked to and requested Hartwell to do it, and the latter said he would. Hartwell testified that he told Clark that when the matter was arbitrated he would do his best to see that the arbitrators allowed salvage, and if they did so the crew would receive salvage.

It is clear from the evidence that the crew had notice of efforts being made by the owners of the Nimrod to have a settlement of the compensation for salvage, and expected to get a share of such compensation, and considered that they were being represented by Hartwell in such settlement. The evidence shows that none of the crew took any action against or made any claim on the Managua for salvage until after she had settled with Hartwell, and after Clark had asked Hartwell if there had been a settlement, and inquired about the salvage for the crew. Hartwell told him of the settlement, but denied their right to any of the money he had received for the owners, and said they must look to the Managua for their salvage compensation. Clark then for the first time demanded of the Managua salvage compensation for himself and crew. Her master declined to pay them anything, saying he had settled for the salvage with the owners of the tug, whereupon this libel was filed.

The fact that no officer or other member of the crew made any claim on the Managua until after her settlement with Hartwell, and after Clark's inquiry of him and his denial of their right to share in the salvage money received by him, is conclusive to my mind that Hartwell was authorized to represent them in the adjustment and settlement of the salvage, and that they expected their share of salvage from the money he had received. Hartwell in his testimony virtually admits his authority in the matter, if the salvage compensation was awarded by arbitration.

I fail to perceive that the fact that the compensation paid was by voluntary agreement could in any wise affect Hartwell's authority to represent the crew in getting salvage, or can make any difference in their right to share in it when obtained. If the amount paid was for salvage, it is immaterial whether it was awarded by an arbitration, was agreed on by the parties, or was ascertained by the decree of a court. The fact that the arbitration did not take place cuts no figure in the case so far as the rights of the crew are concerned.

The case of the Olive Mount (D. C.) 50 Fed. 563, is in many respects like this one. It was a libel filed by four seamen of a tug

which rendered salvage services to the bark Olive Mount. The owners of the bark paid to the towboat company, the owners of the tug, $2,500 as full compensation for the salvage services. The libelants afterwards made demand upon the company for their share of the reward, and, the company refusing to pay them as much as they claimed, they brought suit against the bark. The learned judge said:

"They [the libelants] all had knowledge of the negotiations going on between the owners of the vessel and the company for the settlement; but they made no objections, set up no separate claim, nor asked or expected to be consulted. * * * They claimed their share after the money was paid, and it was only after their failure to come to an agreement with the company that they brought this suit. Their demand on the company ratified the settlement, even if no previous authority had been given. Their remedy is against the towboat company, and not against the vessel. * * * When the owners of a vessel which has performed a salvage service make a settlement with the owners of the property saved, the crew may recover from them a due share of the reward by a libel in admiralty. The settlement was a just one, and was authorized by the libelants, and, if they are entitled to salvage by the terms of their employment, they can bring their suit against the towboat company, which collected it, and is entirely responsible, and they should have done so." 50 Fed. 563.

If it be conceded that the libelants in this case are entitled to salvage by the terms of their employment, under the circumstances of the case it would, in my opinion, be manifestly unjust for the court to make an additional award for the same service, for which the owners of the Nimrod have already been fully paid. The Wellington (D. C.) 54 Fed. 901.

Libel dismissed, with costs.