### THE HENRY MAURER.

(District Court, D. Massachusetts. June 2, 1914.)

No. 1001.

SALVAGE (§ 13*)—NATURE OF SERVICE—ASSISTING TUG WITH BROKEN PROPELLER.

A tug, which went to the assistance of another tug and her tow, anchored in Buzzard's Bay on account of a broken propeller, in fair weather, and towed them to port, *held* entitled to compensation for a salvage service, but of a low order, as the disabled tug and her tow were in no immediate peril, nor was the rescuing tug exposed to any particular danger.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 16, 23–25; Dec. Dig. § 13.*]

In Admiralty. Suit by Nathaniel P. Doane and others against the steam tug Henry Maurer; John R. Burke, claimant. Decree for libelants.

Russell, Moore & Russell, of Boston, Mass., for libelants.
William E. Burke, of Boston, Mass., for claimant.

HALE, District Judge. This is a libel for salvage. On the morning of September 29, 1913, at about 9 o'clock, the steam tug Henry Maurer, owned by John R. Burke, was towing scow No. 6, loaded with

750 tons of sand, from the southerly end of Cape Cod Canal, down the dredged portion of the canal, near Buzzard's Bay, for the purpose of unloading the scow at the dumping ground in the westerly part of the bay. The Maurer had proceeded about three miles, and had left the channel to go toward the dumping ground, when its propeller was broken, and dropped off, and the tug came to anchor. The weather was clear. The tide was ebbing, and was about half out; it was running in a southwesterly direction at the point where the accident happened. The wind was blowing quite strong from the southwest; the sea was choppy and rough. At a distance of about a quarter of a mile to the northeast there·was shoal water; Wing's Flats lay a little more than a mile beyond; while in a northeasterly direction was the shoal water to the southwest of Mashnee Island. The scow drew 11 feet of water; the Maurer 6 feet.

The scow was valued at $3,500; the tug, at $7,000. The libelant's tug, the William H. Yerkes, Jr., was in the employ of the Furst-Clark Construction Company, which company was doing the dredging work on the Cape Cod Canal. At the time in question, the tug was lying below the railroad bridge at the southerly end of the canal, about 3 miles from the scene of the injury, when a message came from the assistant superintendent of the Construction Company that the tug was in distress off Wing's Flats. Capt. Johnson of the Yerkes immediately started down the dredged portion of the canal to go to aid the Maurer. He went out of his way some 2 miles, down the dredged part of the canal, and around the sand spit. He then turned and bore in a northeasterly direction through water which he thought was somewhat shoal, going slowly, and sounding. He reached the Maurer and the scow; he threw a line to the scow, and took it in tow, securing the Maurer by its towing hawser to the scow. He proceeded back over the same ground around the sand spit into the channel. In this way the Yerkes brought both the Maurer and the scow a distance of about 3½ miles, back to a safe position.

It is contended by the libelants that the services rendered by the tug Yerkes should be rewarded as salvage services. The respondent, John R. Burke, the owner of the Maurer, urges, on the other hand, that the services were not salvage services; that at no time was salvage within the contemplation of the parties; that the Maurer and scow were in no danger, nor was the Yerkes at any time in any danger; that if any compensation was earned by her it was on a towing basis, and not for salvage; that if any compensation was due for such services, it was due to the Furst-Clark Construction Company, which, under its contract with the owners of the tug, was entitled to the exclusive services of the Yerkes.

The testimony tends to show that the vessel was found anchored with an anchor weighing 150 pounds, and adequate to hold her; that the anchor was suitable to relieve the scow from any imminent danger; that it took some time for the Maurer to break out the anchor; that it seemed probable that the scow would remain for 2 hours or more, or until the tide turned, in practically the same position in which she was found. No storm was imminent. The Maurer was in good condition.

able and seaworthy. It was not unusual for scows to ground in and near the canal; by such grounding they were not likely to receive much if any, injury, in the soft sand where they would lie, as all along near the canal there was shallow water where a scow would find the bottom; and the farther she drifted up the canal the less sea and wind was to be encountered, and consequently there would be the less liability of injury. It is true, however, that the Maurer had lost her propeller, and that neither it nor the scow could move by its own power; that when the tide turned, if relief did not come, both vessels might be borne upon the shoals. The Maurer would have to go with the scow, or cut loose, and take the chance of being grounded.

At the time of the accident, the captain of the Maurer first shouted to the men to use the anchor in the scow; he blew at once for help. He testifies:

"I blew the whistle perhaps two or three times, perhaps three different times, six, seven, or perhaps eight blasts, simply to call the attention of some one."

He then hailed a cat boat and asked to be taken ashore, so that he could telephone that "we were down in there in a helpless condition." He does not admit that either the Maurer or the scow were in any danger, but says that he was without means of moving and simply wished to be towed in; and if that could not be done, to arrange with a certain dredge owned by the respondent, and located at Onset, about 3 miles away, to have lines and gear brought down to the Maurer and to the scow in order to secure them. Capt. Snow says, too, that there was always more or less grounding at the canal; that he had received similar assistance from other boats, and never knew any charge had been made for them; that there was a friendly, reciprocal feeling between boats at the canal, and that he supposed the services were not intended for anything more than friendly services, rendered without pay.

The whole testimony induces me to believe that the Maurer and the scow were in some danger, and in need of some assistance; the service rendered by the Yerkes was a voluntary service; but I think there was no distinct, affirmative intention to render the service without reward. The Yerkes went promptly to a vessel in distress for the purpose of rendering whatever help it could. I am not satisfied, however, that this service placed the Yerkes in any substantial peril.

She was under contract to the Furst-Clark Construction Company. There is some conflict of testimony as to precisely what this contract was; but from all the evidence I conclude that the contract called for the services of the Yerkes in "tending, dredging, and towing to sea." Whatever services it rendered to the Maurer and the scow were not, I think, within the terms of its contract with the Construction Company. The testimony does not indicate that the Yerkes was ordered by the representative of the Construction Company to go to the aid of the Maurer, but that it was permitted to render such aid as a matter of good conduct, for the relief of a vessel in some need of help. I think the reward for whatever services were rendered may properly be paid to the libelants, and not to the Construction Company.

The testimony does not, I think, warrant me in finding that the Maurer and the tug were in imminent peril at the time the Yerkes went to their relief. They were, however, in need of some assistance. The service rendered by the Yerkes was rendered, without delay, to a vessel with her propeller power disabled. In The New Camelia, 105 Fed. 637, 640, 44 C. C. A. 642, 644, the Court of Appeals for the Fifth Circuit said:

"There is much authority to hold that the New Camelia, when in the open lake, with her shaft broken, her propeller power disabled, was so far disabled as to need assistance, and, although not in immediate peril, was so in distress as to justify the use of the word 'salvage' in designating the aid she required. * * * We are constrained to sustain the court * * * in holding that the services rendered by the tug * * * were salvage services; but we must insist that they were of the lowest order of salvage services, and to be compensated on the basis of work and labor. * * * The salvage law must be construed and applied with regard to the rights of property. A vessel that is so unfortunate as to lose its propelling power, thus putting its owners to delay and expense, ought not to be mulcted with large compensation to alleged rescuers who have been minor factors in rendering assistance."

The court made an allowance of $60, although the court below had awarded a much larger sum. The Dupuy de Lome (D. C.) 55 Fed. 93; Ulster Steamship Co. v. Cape Fear Towing & Dredging Co., 94 Fed. 214, 36 C. C. A. 201; The Connemara, 108 U. S. 352, 2 Sup. Ct. 754, 27 L. Ed. 751.

In the case before me, I find that the salvage service was of a low order. It was, however, prompt, voluntary, and of some merit. I fix the award at the sum of $90 for the total amount of salvage service rendered to the tug Maurer and the scow. I award two-thirds thereof to the owners of the Yerkes, and one-third thereof to the crew of the Yerkes; and I order the libelants to distribute to the crew their proportion of the sum awarded, based upon their monthly wages. The libelants may recover costs.