## THE SIRIUS.

## THE SIRIUS v. CEDROS ISLAND MINING & MILLING CO., (LOWE et al., Interveners.)

### (Circuit Court of Appeals, Ninth Circuit. July 17, 1893.)

### No. 103.

1. SALVAGE—CONTRACT FOR TOWAGE—DURESS—AMOUNT OF COMPENSATION.

On a libel on contract for salvage services rendered by the steam schooner Tillamook to the steamer Sirius, the evidence showed that the Sirius, having lost her propeller and part of her shaft, was placed under such sail as she had, and, after drifting for three days, was anchored in a bay of an island off the coast of Lower California; that she was in a dangerous position, as she could not get an offing with her small sail power, and in case of a southerly gale might go ashore; that the master of the Tillamook, which came to her assistance, proposed either to tow her to San Diego for $20,000, or to furnish stores, and gratuitously take an officer to San Diego to procure assistance; that the original purpose of the master of the Sirius was to send to San Diego for assistance; that he was positive his position was safe, and that he could get to sea before a southerly storm became dangerous; that he decided not to send an officer to San Diego, as he wished to avoid lengthening his voyage; that he claimed that $20,000 for the towage services was unreasonable and exorbitant, and proposed either a reduction in the charge or arbitration, or to leave the question to the owners to settle; and that his propositions were rejected by the master of the Tillamook. The master and purser of the Sirius testified that the master of the Tillamook demanded "$20,000 or nothing, and I want you to talk quick, or I will leave you." The master of the Tillamook testified in an unsatisfactory and contradictory manner that in the conversation he expressed a doubt of the ability of his vessel to tow the Sirius, and offered to leave the question of compensation to the court. The negotiations occupied an hour and a half. The contract for the towage service was drawn by the purser of the Sirius, and subsequently signed by her master. The Tillamook was valued at $32,000, and the salvage property at $143,539. *Held*, that the service rendered was a salvage service, and not a towage service; that, under the circumstances, the bargain was inequitable, the price agreed on exorbitant, and that $8,000, with interest from the date of the service, was fair compensation. The Wellington, 52 Fed. Rep. 605, distinguished. The Sirius, 53 Fed. Rep. 611, reversed.

2. SAME—APPORTIONMENT.

The award should be distributed as follows: $5,300 to the charterers of the Tillamook, $1,000 to her master, and $1,700 to the other officers and crew of the vessel, according to their relations to the service performed, their extra work, and their regular wages. The Sirius, 53 Fed. Rep. 611, modified.

Appeal from the District Court of the United States for the Northern District of California.

Libel by the Cedros Island Mining & Milling Company against the British Steamer Sirius, her cargo, J. Lowe and others, interveners. From a decree for libelant, (53 Fed. Rep. 611,) John Meek and H. M. Gregory, claimants, appeal. Reversed.

Andros & Frank, Page & Eells, and E. W. McGraw, for appellants.

George Fuller, Walter G. Holmes, and H. W. Hutton, for appellees.

Before McKENNA and GILBERT, Circuit Judges, and HAW-
LEY, District Judge.

GILBERT, Circuit Judge. On the 20th day of February, 1892,
the steamship Sirius, while on her voyage from Central American
ports to San Francisco, was disabled by the loss of her propeller at
a point 55 miles north of Cedros island. By the use of such sails
as she had, and with the aid of currents, she arrived in the course
of three days at Cedros island, and made anchorage in a bay on the
southerly side of the island, called "South Bay." Upon the easterly
side of the island, and about 30 miles from South bay, the steam
schooner Tillamook, an American vessel of 208 tons burden, was
lying at anchor, near a mining camp, prepared to take on board a
cargo of freight which she was to carry by way of the port of En-
senada, 217 miles distant, to the port of San Diego, Cal. The time
required for her usual voyage to Ensenada was 30 hours, and from
that port to San Diego, 8 hours. On the morning after his arrival
at South bay the master of the Sirius sent the purser in a small boat
up to the mining camp, where the Tillamook lay, in the hope of
finding a steamer by which he could send information to San Diego
of the condition of the Sirius. The purser reached the Tillamook
the same day, and on the following morning the captain of the Tilla-
mook hoisted the purser's boat upon his vessel, and steamed down
to South bay. On arriving there the master of the Tillamook went
on board the Sirius, and had a conference with the master of the
latter vessel, concerning the towage of the Sirius to San Diego.
The master of the Tillamook offered to perform that service for
$20,000. The master of the Sirius considered that sum exorbitant,
and asked the master of the schooner if he would not consider a less
sum. He also offered to leave the matter of compensation to arbi-
tration, or to the owners of the respective vessels. The master of
the schooner insisted upon the sum first named, and, after consider-
ing the matter for more than an hour, the master of the Sirius
accepted the terms, and the masters of the two vessels signed a
written contract as follows:

"It is hereby agreed between Captain H. S. Hamm, captain and master
of S. S. Tillamook, and Captain H. M. Gregory, captain and master of Br.
S. S. Sirius, that the said master of the steamship Tillamook will tow the
steamship Sirius to a safe anchorage in the harbor of San Diego for the sum
of twenty thousand dollars U. S. gold coin, to be paid in San Francisco by
said master of S. S. Sirius on account of owners, all coal and necessary help
to be furnished by the Sirius."

The Tillamook then took the Sirius in tow, and towed her up to
the mining camp, where the vessels remained over night. The
next morning, February 26th, the Tillamook again took the Sirius
in tow, and in a little less than four days brought her safely to
anchor at San Diego, having towed her about 320 miles. During
all of this time the weather was fair. No danger or difficulty was
experienced, and no damage was done to either vessel. On the

morning following the arrival of the vessels at San Diego, a southeasterly storm arose, which lasted through the ensuing night. The value of the Sirius with her cargo and freight money was $143,539. The value of the Tillamook was $32,000. The libel was brought to compel payment of the agreed stipulation. The district court sustained the libel, holding the contract valid, and a decree was entered against the Sirius for the sum of $20,000 and interest and costs.

On the appeal the following assignments of error are made: That the court erred (1) in holding that the written contract was valid; (2) in finding that the same was not executed under duress; (3) in finding that the compensation therein stipulated for was not exorbitant; (4) in awarding $20,000 salvage, when the evidence disclosed that less than half the sum would have been a large award for the services rendered; (5) in allowing interest from the date of the decree.

The consideration of these assignments of error involves an examination of the testimony concerning the situation of the Sirius at the time the contract was made, the negotiations out of which the contract arose, and the nature and value of the service rendered. There can be no doubt that the Sirius was in peril. That fact is conceded by the counsel for both the appellants and the appellees. She had some sails upon her foremast, but none upon her mainmast. Her shaft was broken and her propeller was lost. She lay at anchor near the center of the bay. The testimony of disinterested and experienced seamen would indicate that in case of a southerly wind, such as subsequently occurred on the morning of March 2d, she could not have gotten out to sea, but would have been driven upon the beach, and wrecked. The bottom of the bay was sandy, and afforded insecure anchorage. The presence of a large quantity of kelp increased the difficulty of reaching the open sea. Although the wind at that time was from the northwest, the prevailing winds at that season were southerly. The nearest telegraph station was at Ensenada, about 250 miles away. The only apparent means of relief, other than the towage offered by the libelant, were either to send a messenger to Ensenada to telegraph thence to San Diego for a tug boat, or to intercept one of the south-bound steamers running from San Francisco to Panama. Of these there were known to be two,—the Newbern, which would not leave San Francisco until the 1st of March, and the Panama, which in her regular course would pass so far to the westward of the Cedros islands that to intercept her by means of an open boat was considered impracticable.

Concerning the conversations between the masters of the two vessels at the time of and prior to making the contract there are but three witnesses, the masters themselves and the purser of the Sirius. The master of the Sirius testifies that the conversation was as follows:

"I then asked him what he would tow me up to San Diego for. 'Twenty thousand dollars;' that was his answer. I then told him that was exor-

bitant, and I would not pay it. He reiterated again: 'Twenty thousand dollars or nothing, and I want you to talk quick, or I shall leave you, and go back to the mining camps.' I asked him if he would submit the matter to arbitration. He positively declined. Twenty thousand dollars or nothing were his terms. There was no use in offering him anything less. I understood that thoroughly. It was twenty thousand dollars or nothing. I then asked him if he would take an officer to San Diego for me, to communicate with my owners. He said he would do it, but I must hurry up. He left my cabin. I then turned to the purser, and consulted with him about the matter. We concluded that under the circumstances there was nothing to do but to accept his terms."

The purser's account of the interview is substantially the same:

"Captain Hamm says, 'Well, you want a tow?' Captain Gregory says, 'Yes.' He said, 'I will tow you for twenty thousand dollars.' Captain Gregory says: 'That is an outrageous price. Can't you tow me any cheaper than that?' He says, 'No, not a cent cheaper.' He says, 'Will you leave it to arbitration in San Francisco?' He says, 'No.' He says, 'Will you submit it to our own owners, to the owners of both ships, and allow them to settle it?' He says, 'No, I won't.' He says: 'I haven't got much time, and,' he says, 'you must hurry. I am going to get out. I will take the purser to San Diego if he wants to go, but I have to get out, and I want you to hurry up, too.'"

The testimony of the tug master as to the language of the interview differs from that of the captain and the purser of the Sirius in two important particulars: First. He testifies that at the beginning of the conversation he expressed a doubt of the ability of his vessel to tow the Sirius. "I said my vessel is too small to tow you up. I don't know if I could do it." Second. He adds the statement that after offering to tow the Sirius to San Diego for $20,000 he made an alternative proposition, to wit, that he would leave it to the court to decide what the compensation should be.

There is no finding of the fact in the decree appealed from that this offer to leave the compensation to the determination of the court was actually made by the master of the tug. A careful consideration of the evidence convinces us that no such proposition was made. In the first place, the testimony of the tug master upon this subject is distinctly denied by both the master and the purser of the Sirius. The former testifies:

"There was no talk made at any time about referring the matter to the court. Of that I am thoroughly positive. There was but one question that I was allowed to discuss, and it was twenty thousand dollars or nothing."

In the second place, the testimony of the master of the Tillamook upon this point is unsatisfactory and contradictory. He first testifies that on boarding the Sirius he went into the captain's room, accompanied by the purser of the Sirius, and there met the master of the Sirius, and that the conversation was as follows:

"I said: 'My vessel is too small to tow you up. I don't know if I could do it. If I have to charge, I have to charge that price, which is twenty thousand dollars; but,' I says, 'if you don't want to do that we will leave that over to the court, and let the court decide what price I shall have.'"

Upon his cross-examination, being repeatedly asked to repeat the conversation in detail, he did so, but in each instance omitted

all reference to the proposition to leave the compensation to the court. Subsequently, on cross-examination, he testified as follows:

"Question. And before the agreement was drawn up you made him this offer? Answer. He made me the offer first to leave it to arbitration, which I did not accept. I told him to leave it to the court, which would do for me. Q. Then he sat down and wrote the agreement? A. Yes, sir. Q. Right there in your presence? A. Right there in my presence. Mr. Brewster [the purser] wrote it in the presence of me and the captain."

It will be observed that up to this point in his testimony the witness locates all the negotiations in the captain's room, and in the presence of the purser. Upon a later cross-examination, when asked to state who was present when he made this particular proposition, he changes the place of conversation and answers:

"I think the captain came out of his room, and spoke to me on deck. Question. Who was present, and whereabouts was it? Answer. On the port side of the house, out on deck. Q. Who was present? A. Me and the captain. Q. Anybody else? A. No, sir."

The purser, who testifies "they had no conversation at which I was not present," says that he heard nothing concerning the proposition to leave the question of remuneration to a court, and that he paid particular attention to all that was said, and would have heard it if anything of the kind had occurred. There is, moreover, an inherent improbability in this portion of the narrative of the tug master. It is difficult to believe that the master of the Sirius, who confessedly protested against the price demanded for the towage service as exorbitant, and urged that the same be left to arbitration, or to the determination of the owners of the two vessels, would have declined a proposition which was substantially the equivalent of his own, and which would have relieved him from the responsibility of agreeing to pay the price which he denounced as exorbitant, and would have left the whole matter to the adjudication of a court of admiralty. It is scarcely to be conceived that rather than do this he would deliberately have chosen the alternative of binding his owners and consignees to the payment of so extraordinary a sum. It is likewise improbable that the master of the tug, who persistently refused to entertain the propositions of the master of the Sirius, and answered all protests and inquiries with his proposition to tow them to San Diego for $20,000, that or nothing, and who, as the purser says, caused the contract to be drawn in triplicate, and with great care, so that no loophole should exist for the escape of liability to pay the sum agreed upon, would have been willing to accept the award of a court of admiralty for the service for which he was contriving to obtain so excessive a price.

Viewing the whole transaction in the light of the evidence and the circumstances, it would appear that the master of the Tillamook was from the first intent upon securing a profitable bargain out of the necessity and danger of the Sirius. Before arriving at South bay he had evidently decided upon his price. When his terms were demanded he required no time to consider his answer. It was

$20,000, that or nothing; and he was in a hurry, too. True, he was willing, when asked, to take with him an officer to Ensenada or San Diego free of cost, also to wait for the captain's letters, but we fail to perceive in this fact any indication of his reluctance to undertake the towage, or any indifference concerning the acceptance or rejection of his offer. There may have been an apparent indifference assumed for a purpose. His own testimony that he was reluctant to undertake the towage, and that he expressed distrust of the capacity of his steamer to accomplish the same, is not corroborated by any witness or by any circumstance. The conduct of the master of the Sirius in signing the contract whereby he agreed to pay $20,000 for a service the actual value of which was not more than one-tenth of that sum, can be explained only upon the theory that his vessel was in peril, and that he was influenced by a consciousness of that fact. In his testimony, it is true, he does not say this; on the contrary, he expresses his belief that his vessel was not in serious danger, and that he would have been able to extricate her in case of a change in the wind. He went so far as to say that the real reason why he did not choose the other alternative offered him, and send to San Diego for assistance, was the loss of time that would have resulted; but it is to be noted that on being asked if there were any other reason, he answered: "No, sir, except to get my ship out of that position. In case southerly weather had come up, I would have been compelled to go to sea." Elsewhere in his testimony, in answer to the question whether he considered himself in a safe position where he was, he answered: "That is a question that is rather difficult to answer. I can say 'Yes' or 'No.' I think, so far as my own judgment as a seaman goes, * * * I should certainly have thought that I could get my ship out, and I think I could have before any southeaster came up to endanger my ship." When we consider the condition in which the vessel would have been if he had got her out to sea, rigged as she was, and crippled by the loss of her propeller, it is apparent that her peril would still have been very considerable; otherwise no reason is perceived why the master of the Sirius should in the first instance have taken his vessel from the open sea, where she was drifting, and brought her to anchor in South bay, where the anchorage was bad, and where, as he admits, he was in a dangerous position, but for the fact that he anticipated sufficient warning of a change in the wind before a southerly wind would fairly be upon him, and prevent his escape.

The towage service was rendered by the tug without difficulty or danger to the latter. The weather was fair, and nothing occurred to interfere with the steady and regular progress of the two vessels towards the port of San Diego. There is an attempt made to show that there was risk to the Tillamook from the fact that an unusual and severe strain was put upon her machinery, and it is also claimed that if stormy weather had arisen she would have been in danger of having the hawser get foul of her pro-

peller. So far as these arguments are concerned, we deem it a sufficient answer to say that it is not apparent to us from the evidence that there was any peril to the towing steamer. It does not appear that any injury was actually received by her, or that there was necessarily any danger to her machinery. The weather remained fair during the whole of the service, and if a change of weather had occurred there was nothing in the situation to compel the Tillamook to continue the service at her own peril.

Should the contract, made, as it was, under these circumstances, be enforced? The law applicable to the subject is well expressed in the decision of the supreme court in Post v. Jones, 19 How. 158:

"Courts of admiralty will enforce contracts made for salvage service and salvage compensation where the salvor has not taken advantage of his power to make an unreasonable bargain; but they will not tolerate the doctrine that a salvor can take advantage of his situation, and avail himself of the calamities of others, to drive a bargain; nor will they permit the performance of a public duty to be turned into a traffic or profit. The general interests of commerce will be much better promoted by requiring the salvor to trust for compensation to the liberal recompense usually awarded by courts for such services."

The doctrine thus declared early in the history of the court has been affirmed in more recent decisions. In the case of The Tornado, 109 U. S. 117, 3 Sup. Ct. Rep. 78, the court said:

"Every agreement for salvage compensation is subject, as to amount, to the judgment of the court as to its being equitable, and conformable to the merits of the case."

There can be no question that the service rendered by the Tillamook was a salvage service, and not one of mere towage. This is distinctly alleged in the libel. The averments are that the Sirius was in an entirely helpless and disabled condition in consequence of the breaking of her shaft and the loss of her propeller, and that her sails were not sufficient to keep her head to the sea, or to prevent her from drifting with the currents, and that, had it not been for the assistance so rendered her, she and her cargo and the lives of all on board would have been in danger of being lost. The evidence sustains these averments. It is equally clear that the price charged by the Tillamook was an exorbitant one. She was put to little inconvenience or expense. She deviated but little from the course of her regular voyage, and it is not shown that she thereby suffered loss of other business. The Sirius was subsequently towed from San Diego to San Francisco, by a tug which left the latter port for that purpose, at an expense of $1,200. There is some intimation in the testimony that, owing to competition in towage, this price was unusually low, but, after making due allowance for this fact, and for every contingency that might have arisen in the performance of the contract undertaken by the Tillamook, we are unable to find that the actual value of the service rendered by her was more than one-tenth the amount stipulated in the contract.

The case of The Wellington, 52 Fed. Rep. 605, is cited as affording a precedent to sustain the decree of the court below. The Wellington, while bound to San Francisco with a cargo of 2,350 tons of coal, lost her propeller blades, and drifted near the mouth of the Columbia river. While in communication with the steamer Sussex, which offered to tow her to safe anchorage near the Columbia river, she hailed the steamer Monserrat, which was bound for San Francisco. The Monserrat was not fitted for towage services, and was also laden with coal. Her master offered to tow the Wellington to San Francisco, and to leave the compensation to the decision of the owner of the latter vessel. That offer was rejected, and $15,000 was finally agreed upon. Neither vessel possessed a suitable towline, and five small lines were used. This, in case of bad weather, would have been a source of danger. The weather, as it turned out, was fair, and the vessels arrived in five days. The court held that, while the compensation was excessive, yet in view of the fact that there were other means of relief offered there was no compulsion, and that it was not so exorbitant as to justify the court in setting it aside. That case differs from the case at bar in two important features. In the first place, the disparity between the price agreed to be paid for the service rendered the disabled vessel and its actual value was very materially less in that case than in this; and, in the second place, in the case of the Sirius there was no choice of means of relief. The proposition to take a messenger to Ensenada, and thus procure assistance from San Diego, was not the presentation of a means of present relief, and did not offer a deliverance from the danger of the situation.

In our view of the facts, therefore, the master of the Tillamook took an unfair advantage of his power, and made an inequitable bargain, not conformable to the merits of the case, and the towage contract should not be enforced. The facts of the case at bar are not unlike those in the case of The Costa Rica, 3. Sawy. 610. The Costa Rica was disabled by the breaking of her propeller shaft at a point 130 miles south of San Diego. She was bound from Panama to San Francisco. She was towed into San Diego by the steamer Newbern. The latter vessel was engaged 44½ hours in the service, and consumed at her own expense coal of the value of $800. At the time the Newbern took hold of the Costa Rica the latter was in no immediate danger. She was imperfectly rigged for sailing, but with favorable winds she could probably have reached Cape Colnette, where there was safe anchorage, in 18 or 20 hours, or she could have made the port of San Diego in 4 or 5 days. The total value of the salved ship, cargo and freight, was $244,756. The value of the Newbern and her cargo was $242,000. The court allowed salvage in the sum of $10,000. The time occupied in rendering the salvage service in the case of the Costa Rica was only one-half that occupied in the case before the court, but the value of the property salved in that case

was considerably greater than in this, while the value of the vessel and cargo rendering the salvage in that case was eight times greater than in this.

In our opinion, a liberal recompense to the Tillamook for the salvage service rendered in this case would be the sum of $8,000. The case is therefore reversed and remanded, with instruction to enter a decree for the libelant for that sum, with interest from the date of the service rendered, and the costs in the district court, the same to be apportioned among the libelants and interveners in the ratio adopted in the decree appealed from; and that the appellants recover their costs on this appeal.