## THE CELTIC CHIEF.

### (Circuit Court of Appeals, Ninth Circuit. January 10, 1916.)

#### No. 2426.

1. SALVAGE ⬅21—RIGHT TO COMPENSATION—FORFEITURE.

A tug went to the assistance of a steamship stranded on a reef outside the harbor of Honolulu, and for more than 50 hours, most of the time with other vessels, pulled constantly, rendering valuable service in preventing the swell from driving the stranded ship further on the reef. At the end of that time she refused the request of the master of the ship to give her place to a larger vessel, and her hawser was cut and she was discharged from further service, but continued to stand by. *Held* that while she was properly discharged for refusing to give up her place, she did not, because of such refusal, forfeit her right to compensation for the service rendered.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 48–51; Dec. Dig. ⬅21.]

2. SALVAGE ⬅27—AMOUNT OF COMPENSATION—RELEASING STRANDED STEAMSHIP.

Another vessel owner, which employed in all four vessels in assisting the steamship, three of the aggregate value of $240,000, with crews of 97 men, being used at the same time in pulling and in lightering 365 tons of cargo, *held* entitled to a salvage award of $12,500, in addition to extra expenses; the value of the ship and cargo salved being about $135,000, and the service extending over the greater part of three days and nights, but not, owing to fine weather, being attended with any great danger. Another company, which employed in all five smaller vessels, of the aggregate value, with their equipment, of about $20,000, *held* entitled to an award of $6,500; the total amount of salvage awarded, in addition to expenses, being $19,500.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 65, 66; Dec. Dig. ⬅27.]

3. SALVAGE ⬅21—RIGHT TO COMPENSATION—FORFEITURE BY MISCONDUCT.

The fact that the manager of the company which owned the latter vessels, who was also the principal stockholder and in charge of their work, knew that the ship was moving some two hours before she came clear, but did not tell her captain, who, with others, was in the cabin, for the reason that he wished his vessels, which were the only ones then pulling, to have the credit, and the fact that he expressed the hope that, when the ship came clear, she would bump a foreign naval cruiser which had reluctantly come to her assistance and was directly astern, it appearing that no injury resulted therefrom, *held* not sufficient to deprive his company of the right to a salvage award for the services of its vessels, which were distinctly meritorious and effective.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 48–51; Dec. Dig. ⬅21.]

Ross, Circuit Judge, dissenting in part.

Appeals from the District Court of the United States for the Territory of Hawaii; Chas. F. Clemons, Judge.

Suits in admiralty for salvage by the Inter-Island Steam Navigation Company, Limited, owner of the steamers Helene, Mikahala, Likelike, and Mauna Kea, for itself, the officers and crews of said steamers, and other servants of said owner, by the Miller Salvage Company, Limited, owner of other vessels, and by the Matson Navigation Company, owner of the tug Intrepid, for itself and the officers and crew

of said tug, against the British steamship Celtic Chief, John Henry, master and claimant. Decrees for libelants, and claimant appeals. Modified and affirmed.

Holmes, Stanley & Olson, of Honolulu, T. H., and E. B. McClanahan and S. H. Derby, both of San Francisco, Cal., for appellants.

W. O. Smith and L. J. Warren, both of Honolulu, T. H., and Charles P. Eells and W. H. Orrick, both of San Francisco, Cal., for appellees Inter-Island Steam Nav. Co. and Matson Nav. Co.

Philip L. Weaver and J. Alfred Magoon, both of Honolulu, T. H., for appellee Miller Salvage Co., Limited.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge (concurring in part and dissenting in part). These are salvage causes, consolidated and tried together in the court below, and so submitted here. All of the libels were filed against the British ship Celtic Chief, her cargo and freight—the original libel of the Inter-Island Steam Navigation Company, Limited, claiming $35,000, that of the Miller Salvage Company claiming $20,000, and that of the Matson Navigation Company claiming $15,000 for the salvage services alleged. Subsequently the Inter-Island Company reduced its claim to $25,000, and the Matson Company reduced its claim to $10,000. Each of the libelants conceded that, in addition to its own efforts in the alleged salvage operations, "some very slight assistance" was rendered the distressed ship by the German cruiser Arcona, in whose behalf no claim for compensation was made.

The evidence and the findings of the trial court show these, among other, facts:

That about 2:30 o'clock in the morning of December 6, 1909, which was Sunday, the Celtic Chief, bound from Hamburg, Germany, to Honolulu, with a cargo mainly of fertilizer, and a small quantity of general merchandise, ran aground on a shore reef about half a mile to the westward of the channel entrance to the harbor of Honolulu. Her master, Capt. Henry, knew nothing of the Hawaiian waters, and in approaching the harbor the previous evening was warned by the harbor pilot, Capt. Macaulay, that he was too close to a reef, which advice being unheeded, the pilot at once boarded the ship and offered the captain further advice in respect to his entry, which was also disregarded, resulting in the ship running lightly aground on the reef about 9 o'clock that night, where she remained until 2 o'clock the following morning, when an off-shore breeze arose, in which the captain endeavored to make the open sea, but the breeze dying down left the ship in about the same position as before. The reef there runs east and west in ledges of coral rock, the outer ledge arising abruptly out of deep water and extending back in a northerly direction on a plane of very slight grade for about 1,000 feet to another ledge from 2 to 4 feet higher, the surface of the outer ledge presenting patches of sand interspersed with hummocks of outcropping coral, some of them of boulder size. The sea bottom at the place mentioned shows superficially more sand than coral; the dominant character of the reef

being coral rock, somewhat sharp and of some degree of hardness, but at its surface not hard enough to withstand grinding under the moving weight of such a vessel as the Celtic Chief.

The air continued calm until about daybreak of Monday, when a light southeasterly breeze prevailed, instead of the northeast trade winds which blow most of the year; but there were indications of a "kona," which is a period of southerly winds likely to blow strong and steady for several days, not uncommonly developing into a protracted gale. A considerable, but by no means extraordinary, swell was striking the ship on her starboard quarter, and a current of from 1 to 3 knots per hour was running more directly against her starboard; that is to say, the current running more from east to west and the swell more from south to north, the former more parallel with the reef, the latter more at a right angle with the reef. The southerly swell continued throughout the stranding of the ship, varying in height to an average maximum of about 8 feet. The swell broke on the reef somewhat further in than the ship.

Signal lights of distress were burned, but brought no relief. After daylight, however, and about 6:30 Monday morning, a launch called the Huki-Huki appeared, and with a new 4-inch manila hawser pulled on the stern of the ship for about an hour and then withdrew. For that service no claim has been made. About a half an hour afterwards the Matson Navigation Company's tug Intrepid appeared and offered her services to the ship for $20,000, which demand was then reduced to $10,000, and subsequently she commenced the rendering of her services without any agreement as to compensation. She gave the ship a 12-inch manila hawser about 100 feet long, with a 1⅛ inch steel wire about 300 feet long attached to it, making a line of about 400 feet in length, by means of which the tug, from her position almost astern of the ship, pulled more or less continuously until noon of the following Wednesday. The gross tonnage of the tug was 123, net 55, and her engines were of 350 horse power. She carried 12 men, including her master, and her line was attached to the ship's starboard quarter.

When the first assistance came, the ship lay heading in a northeasterly direction, making an angle of about 45 degrees with the reef, with her stern on its outer edge and her bow free, her starboard anchor down. As the current and swell inclined to move the ship further on the reef and into a broadside position, and as her starboard anchor had comparatively little holding power, from the small amount of chain which was out and which could be put out with safety as she lay, it was decided by the master and by Capt. Macaulay, the pilot, who remained on board throughout and was the master's chief counselor during the stranding, to be of great advantage to get the ship at right angles to the reef, so as to receive the sea as much as possible right astern. Accordingly, the starboard anchor was taken up, and with the tug and the launch holding her stern the ship swung around to the desired position, her head pointing northerly, which position was maintained until she came off the reef at 12:20 o'clock Thursday morning.

From the moment of touching the reef until the arrival of the Intrepid the ship was gradually altering her position, being carried for-

ward by the swell; her tendency being toward a position broadside to the reef. After taking the tug's line her position on the reef was easier, but in spite of the efforts of the tug and of the vessels of the Inter-Island Steam Navigation Company, Limited, which shortly afterwards arrived, she kept gradually going in during Monday, until on that night she was aground for her whole length, and moved about 6 feet further in on Tuesday. By Wednesday morning her forward movement had ceased. In this forward movement she had been carried fully 70 feet. Around her, the water forward was 16 feet, amidships 18 feet, and aft 19 feet; her draft laden to the water line, as she was on her voyage, being 20 feet 10 inches forward and 21 feet aft.

The first of the Inter-Island Company's vessels that came to the rescue was the Mauna Kea, which arrived about 10:30 Monday morning; its steamer Mikahala coming about a half hour later. Both passed lines to the ship on their arrival—the Mauna Kea a new 12-inch manila hawser of about 600 feet in length through the ship's port quarter wharfing chock and made fast around the mizzenmast, and the Mikahala a new 8-inch manila hawser through the ship's starboard quarter chock to strong iron bitts on the main deck of the ship. The Mikahala's line was attached to a bridle (or double line) running in through the steamer's midship chocks, port and starboard. On Wednesday the Mikahala ran a second line of the same kind and size from her port chock amidship to the same point of attachment on the Celtic Chief as her first line, and the Mikahala pulled by use of her propellers almost continuously thereafter until the Celtic Chief was floated, having out about 400 feet of towing line and her port anchor down about two points east of the ship's stern, with about 30 fathoms of chain in about 5 fathoms of water, the purpose of her anchor being principally to maintain her in position. Her bearing from the ship was southeast by east. The gross tonnage of the Mikahala was 444, net 354, and her engines were 404 horse power. She carried a crew of 35 men, besides her master, and the effective thrust of her propeller was about 297 tons, both tied up and running free.

On her arrival the Mauna Kea dropped anchor off her port quarter, put a heavy and steady strain on her line, and, after several hours' pulling, parted, it at the ship's quarter chock. The line was again made fast, and the steamer, going full speed ahead in a quick jump, broke it a second time, pulling so hard as to make a 1¾-inch dent in the steel mast to which the line was fast. Again she ran her line to the ship, and pulled until 7 o'clock Tuesday morning, when she left to make her regular scheduled run to Hilo with mail, passengers, and freight, and her place and towing line were taken at about the same time Tuesday morning by the Inter-Island vessel Helene. The Mauna Kea's tonnage was gross 1,566, net 940, and her horse power 2,400. The effective thrust of her propellers was over 12 tons, both tied up and running free, and her crew consisted of 60 men, besides her master. During the time of her pulling her position was southward and a little to the westward of the stranded ship, and during all of such time there was a good strain upon her line.

The Helene took position 635 feet from the Celtic Chief, placed her 2,000-pound anchors for the special purpose of effective heaving on her anchor chains, in addition to pulling by her propellers, having 90 fathoms of chain out from her starboard anchor, and 60 fathoms from her port anchor, these anchors being two or three points apart. Her 12-inch line was not only itself fast to the vessel, but was also attached thereto by a bridle. Her gross tonnage was 618, net 392, and her horse power 470. The useful or effective thrust of her propeller was 3.11 tons tied up and 3.26 running free; her crew consisting of 31 men, besides her master.

At noon on Wednesday the Inter-Island Company's steamer Likelike laid out her anchor ahead about two points off the ship's stern, and passed to the ship an 8-inch manila hawser, which was made fast through the port quarter hawse pipe to bitts on the main deck. The Likelike's tonnage was gross 374, net 214, and her engines were of 340 horse power. The useful or effective thrust of her propeller was about 2.5 tons, both tied up and running free, and her crew consisted of 28 men, besides her master.

Monday morning, at about 7:30 or 8 o'clock, the libelant Miller Salvage Company, Limited, through its principal owner, Capt. Miller, offered its services, without agreement as to compensation, and about 10 o'clock of that day its schooner Concord, its gasoline motorboat Mokolii, and its steamship James Makee arrived, were moored alongside the Celtic Chief, and the lightering of her cargo began; stevedores passing out by hand bags of fertilizer directly into those vessels. After noon of Monday the Miller lighter Kaimiloa was also brought out and similarly employed. The Miller Company's men continued such lightering until 2:30 a. m. of Tuesday, by which time they had taken out 239 tons of fertilizer, which was carried to the wharf and discharged. Tuesday afternoon Capt. Miller brought a 5-ton anchor, which he first placed in a position from which it could not be used, but finally laid it astern of the Celtic Chief, and connected it with the ship through the starboard after chock by powerful lines and a system of triple purchase tackles rigged on the deck of the ship, and worked most of the time from the ship's duplex capstan with 16 men at the bars, and occasionally by the ship's winch. These lines consisted of a new 2¼-inch steel wire cable attached to the anchor and a new 12-inch manila hawser shackled to this wire at about 30 feet from the ship's stern; the manila line being reinforced by a double piece of 1½-inch steel wire. The large manila line was attached to the system of three tackles, through the first, second, and third triple blocks of which ran, respectively, 7-inch, 5-inch, and 3¼-inch falls of new manila rope. The Miller anchor lay about 900 or more feet almost directly astern of the Celtic Chief and a little to the starboard. The Miller Company employed under Capt. Miller from 45 to 60 men, most of them working overtime from 5 to 11 hours, in addition to a full day on Tuesday and Wednesday, and in addition to a three-quarter day on Monday. Besides the vessels named a small gasoline launch, the Elizabeth, was used in that company's operations.

At the request of the master of the Celtic Chief the Inter-Island Company's superintendent, Capt. Haglund, began lightering the ship at about 11 o'clock Tuesday morning, working at the main hatch until noon, and after 1 o'clock at both the main hatch and the after hatch with an increase of men, continuing all that afternoon and evening, and until 2 o'clock Wednesday morning. Men from the crews of the Mikahala and Helene, and extra stevedores, about 100 in all, were thus employed. About 6 a. m. lightering was resumed, and continued until about 11:30 p. m., or shortly before the ship was free. At about noon of Wednesday a floating donkey hoist was moored by an anchor and lay opposite the main hatch of the port side, as a complement to the ship's winch, which was used throughout, but which was inadequate for all the work required. The Inter-Island Company took out about 365 tons of cargo, carrying it in surf boats to the Inter-Island Company's steamers, whence it was discharged at the wharf. At noon of Wednesday the cruiser Arcona, of 2,800 tonnage and 8,200 horse power, and with a full equipment of anchors and lines, came out to assist the ship, at the request of her agent and of the British consul. Monday evening, and again on Tuesday, she had been called upon for aid, but her commander "did not relish the job," and wanted to wait a day to see if the salving agencies at work were not successful unaided. The master of the Celtic Chief, desiring that the Arcona, because of her great power, should have the most favorable position (which was occupied by the Intrepid), requested the master of that tug to cease towing, so that his line could be cast off, but he refused to yield. The ship's master then sent a note in writing to the same effect, stating as his reason for this action the desire "to make a good berth for the man of war," also offering to take the tug's line "from some other part of the ship"; but, as the tug still stood firm, her line was cut by order of the ship's master. The Intrepid then made room for the Arcona, and continued to lie within hailing distance in case of need, though informed that her assistance would not be required further. It was a condition imposed by the commander of the Arcona that his vessel should have the Intrepid's position astern before giving any aid.

The Arcona dropped her port anchor dead astern of the Celtic Chief and a little outside of the position of the Helene. After having parted her first line of manila, which appears to have been merely a messenger for another line, she passed a small wire line of her own to the ship and started ahead at increasing speed. The wire broke almost immediately. This was at about high tide, between 12 and 1 o'clock. She swung around to her anchor and drifted with the swell and current down rather close to the Helene. She hove anchor, and, moving further eastward and seaward, dropped her port anchor again, this time directly ahead of the Mikahala's bow and some 300 or 400 feet distant therefrom. Her stern was then on a line directly ahead of the Mikahala's bow. She paid out more chain and swung westward toward the Helene until she was half way between the Helene and the Mikahala and seaward of them a little. She then ran a wire of her own and took one from the ship, started her engine ahead, and after

pulling for from five minutes to a half hour, broke the ship's wire at about 3 o'clock. She then attempted for several hours to get a long wire aboard the Celtic Chief, but failed, and again ran two wires, using the ship's broken wire, which had been spliced and reinforced. Between 6 and 7 o'clock she had finally made fast and proceeded to "equalize" the wires and to then heave in on her anchor chain, not using her propellers at all. She kept somewhat of a strain on her anchor chain thereafter until the ship floated. About 8 o'clock she turned on her two large searchlights, which afforded a favorable condition for the salvage operations during the rest of the evening.

The trial court said in the course of its opinion:

"The element of danger was clearly present—not the danger of rough weather, though that was actually imminent, but particularly the danger of the ship's being rapidly pounded to pieces on the coral sea bottom, or thrown broadside on the reef, as the testimony shows to have been the case with other ships in this vicinity. She bumped considerably, and was violently shaken when lifted by the swells early in her stranding. These dangers were relieved more and more as the salving agencies came to her assistance. It does not take long for a vessel so heavily weighted to open her seams when lifted and dropped upon a resistant sea bottom, the time of destruction being dependent upon the stress of wind and wave, and that the weather and sea conditions were so favorable was a lucky circumstance. The cargo was practically all of a character perishable on exposure to sea water. The fact that no leak resulted in these three days on the reef shows how effectively her early bumping was checked. It will be said here once for all that the ship was saved without material injury. There was danger to the men who lightered cargo into surf boats—especially the Inter-Island men. The case was a different one from that of lightering from a large vessel riding at anchor, and rising and falling with the swell, but to some of the men presented the peril of working in a small boat close to a solid body against which the sea was pounding, and under an overhanging sling carrying several hundred pounds' weight. The danger to the other men engaged was nothing more than is commonly involved in a seaman's or stevedore's work, except of course, the increase of danger inherent in working under pressure and with engines and appliances strained to their limit of safety. The success of the lightering is demonstrated by the small amount of loss in the lightered cargo—only $1,441."

The court below also made findings respecting the value of the salved property and the damage thereto, and the value of the salving agencies of the respective libelants and their length of service, substantially as follows:

Value of the Celtic Chief, $25,000; conceded value of the cargo, including the freight thereon, $111,000, less $1,441, the damage to the lightered cargo, leaving as the aggregate value of the property salved, $134,559.

The findings regarding the values of the Inter-Island and the Miller vessels are as follows:

"The value of the Inter-Island vessels, with their equipment, and the length of service of these vessels, according to their own witnesses, are as follows:

"Mauna Kea, $325,000, engaged about 20 hours.

"Helene, $100,000, engaged about 42 hours.

"Mikahala, $40,000, engaged about 62 hours.

"Likelike, $100,000, engaged about 12 hours.

"The expenses of the Inter-Island operations, exclusive of regular salaries and wages, were $3,561.77, including overtime of men, extra stevedores, launch hire, use of barge and donkey hoist, extra fuel, loss and depreciation of ropes, lines, and anchor chain and anchor. Overtime cost, $456; and extra stevedores, $1,059.

"The highest value of the Inter-Island ships engaged at any one time was $465,000; the lowest, $240,000.

"The values of the Miller vessels engaged were, according to Captain Miller, as follows:

"Concord, $3,000.

"Mokolii, $8,000.

"James Makee, $15,000.

"Kaimiloa, $2,000.

"Elizabeth, $4,000.

"The value of the Miller anchor and tackle was $12,000. The aggregate of these values is $44,000. The values were shown, by comparison with tax returns and purchase prices and other data, to be so exaggerated that they can be safely discounted to one-half and still be very liberal."

The court below made no finding in regard to the value of the Intrepid, which was, however, admitted to be $30,000.

By its judgment the court fixed the aggregate value of the services of the salvage agents to be $30,000, and deducted therefrom $500 for the services of the Arcona, leaving $29,500, which by the judgment was apportioned as follows: $4,000 to the Intrepid and her officers and men, apportioned in a certain prescribed way; $8,000 to the Miller Salvage Company, Limited, its officers and men, apportioned in a certain prescribed way; $17,500 to the Inter-Island Steam Navigation Company, Limited, apportioned in a certain prescribed way, together with an allowance to the last-named company in the sum of $2,046.77 for expenses, and apportioning the taxable costs of the proceeding as stated in the judgment.

It is contended on the part of the appellees that the services of the Arcona amounted to nothing; that after her first lines parted, without any effect upon the stranded ship, her propellers were not used at all until the ship was floated, and that the lines used by the cruiser after the breaking of her other lines were never taut, but, on the contrary, had no strain upon them, and that she did not move at all until after the Celtic Chief was floated and had approached very close to the cruiser, which latter then got out of the way by means of her propellers, and towed the ship out to sea, where she turned her over to the Mikahala, which towed her to an anchorage; that the fact that the ship, in coming off the reef, moved towards the Arcona, does not warrant the claim that the latter had any part in pulling the ship off, for the reason that she would naturally have moved that way, because the Inter-Island steamers were pulling from both sides of the stern of the ship and balanced each other.

That might possibly be true, had the effective power of the latter boats been the same; but in view of their difference in that respect it is not at all probable. On the contrary, the fact that the stern of the stranded ship, in coming off the reef, was drawn towards the Arcona, gives some confirmation at least to the testimony on behalf of the cruiser that her towing lines were at the time and for hours theretofore had been taut, and is in support of the finding of the trial court that she thus rendered some effective service in floating the ship. The court fixed $500 as the value of that service. Accepting that as correct, we are to inquire what as to the services of the other salvors.

[1] With the exception of the launch, in behalf of which no compensation was claimed, the Intrepid was the first vessel to offer or render any assistance to the stranded ship. It was, according to the evidence and findings, the Intrepid, with such aid as the launch rendered, that relieved the threatened danger of the ship swinging broadside on the reef, from which position it would have been far more difficult to have removed her, if, indeed, it could have been done at all. And that the danger was a real, present one appears, not only from the statement of the master of the ship, but from the testimony of the pilot, Capt. Macaulay, whose conduct throughout the trouble very justly received the commendation of the court below. And that the subsequent hard pulling, at times at least, by the Intrepid on the stern of the ship, was effective in preventing her from going further on the reef than she actually did go, is, we think, very likely. We do not, therefore, consider the award of $4,000 made by the trial court for the services of that vessel unreasonable in amount.

It is contended, however, on the part of the appellant, that the Intrepid was discharged for cause, and that her claim for salvage was forfeited, because she refused to agree to give her place to the cruiser Arcona. She undoubtedly was discharged by the master of the ship because of such refusal. That was about 12:20 p. m. of Wednesday, at which time the tug had been pulling from about 7 a. m. of Monday, and she thereafter continued to stand by, offering her services, although notified that they would not be needed. It is urged in behalf of the latter that she did make room for the Arcona by moving over towards one of the vessels of the Inter-Island Company, and thereby left sufficient room for the cruiser. We think, however, from the record, that it was the duty of the tug to have given place to the Arcona as directed by the master of the stranded ship, and that the latter was entirely justified in cutting the line of the tug and discharging her. Nevertheless, in view of all of the facts and circumstances, we do not think that the award made by the court below for the services of the Intrepid actually rendered should for that reason be here adjudged forfeited.

[2] The services of the Inter-Island Company's vessels appear from the evidence and from the findings of the trial court to have been rendered promptly and with skill under the direction of the superintendent of the company, Capt. Haglund. It is contended on the part of the appellant that compensation for the services rendered by the Mauna Kea was forfeited by reason of the fact that prior to their being effective she was sent upon her regular run between the islands by the superintendent of the company, and the Helene substituted in her stead. Before leaving she had been, as has been seen, engaged in pulling on the stranded ship about 20 hours, at times with a jerk, in the endeavor to move her, but without success. It must be remembered that throughout the salvage operations the weather was good, and that while there was a considerable swell, with the likelihood of strong and steady southeasterly winds, and the possibility of a protracted gale, yet nothing of the sort occurred, and in view of the further fact that there were numerous other vessels immediately

available to render the necessary aid to the distressed ship, one of which was almost immediately put in the place of the Mauna Kea by the superintendent of the Inter-Island Company, we do not think that the latter company should be deprived of a reasonable compensation for the services rendered by the Mauna Kea.

The claim of that company is for the aggregate value of the services of all of its vessels engaged in the undertaking, and in considering what is a just sum to be allowed it for such services the value of the vessels engaged, the number of men employed, the length of time consumed, the situation and value of the salved property, and the danger attending the salvors and their property are all to be considered. While in almost all salvage operations there is more or less danger attending the salvors and the salving vessels, there appears in this case to have been no imminent, nor indeed any great, risk of any kind to any of them. Indeed, in so far as the vessels are concerned, the risk seems to have been very slight, and to have been confined to a possible collision or the possible fouling of propellers, growing out of the breaking or possible breaking of a line or lines. The weather was good and the sea calm, with but a moderate swell. In such circumstances the risk to the vessels could not have been much. And in respect to the danger attending the boats and men engaged in lightering the ship it is manifest from the evidence in the case and from the findings of the court that the danger to them was not great. The master of the Helene, which did a part of the lightering, in answer to the question:

"Referring to the operations of the boats from the Mikahala and the Helene in lightering, would those boats, in your judgment, and were they, in any position of danger in those operations, in your judgment?"

—said:

"Not in extreme danger. They were in more or less danger by being alongside of the vessel by reason of the cargo that was being suspended over the sides on the burthen arms. If the swells happened to come in when the sling of fertilizer was just on the gunwale of the boat, if it got in the right position it would capsize the boat. Except for that, I do not think there was any danger."

The measure of compensation in salvage cases depends wholly on the circumstances attending the services, and one of the principal ingredients is the degree of peril to which the salvor exposes himself and his property. In the present case, the property of the salvors not having been in much danger, too much effect should not be given to its value. The aggregate value of that of the Inter-Island Company "engaged at any one time" was fixed by the court below at $465,000; but in that respect the court was in error, for the Mauna Kea, whose value was fixed by it at $325,000, ceased its 20 hours' work and departed upon or just prior to the arrival of the Helene Tuesday morning. The aggregate value of the three remaining vessels of the Inter-Island Company, namely, the Helene, Mikahala, and Likelike, was $240,000.

The court below, as has been seen from the statement of the case, allowed the Inter-Island Company $2,046.77 for expenses incurred in

its operations, and $17,500 for the services rendered by its vessels and their officers and men. In The Flottbek, 118 Fed. 954, 964, 55 C. C. A. 448, 458, this court, after quoting from its previous decision in the case of Simpson v. Dollar, 48 C. C. A. 663, 109 Fed. 814, 816, the following:

"No exact criterion can be found for estimating the amount of salvage in any case. The judgments of courts must necessarily differ as to the precise amount to be allowed under given circumstances. Where there has been no mistake in fact, or application of an unwarranted rule of compensation in arriving at the award, and the amount allowed cannot be clearly seen to be inappropriate, the courts on appeal have been reluctant to disturb the decision of the trial court"

—added:

"But the appellate courts are the final arbiters, and it is their duty to decide the question fearlessly and impartially, with an eye single to reach the ends of justice"—citing The Sirius, 6 C. C. A. 614, 57 Fed. 851; The Elmbank, 16 C. C. A. 164, 69 Fed. 104, 109; The Haxby, 28 C. C. A. 33, 83 Fed. 715; The Brandywine, 31 C. C. A. 187, 87 Fed. 652; Ulster S. S. Co. v. Cape Fear Towing & Transportation Co., 36 C. C. A. 201, 94 Fed. 214, 219; The New Camelia, 44 C. C. A. 642, 105 Fed. 637.

In view of all of the facts and circumstances of the present case, we are of the opinion that the award of $17,500 made to the Inter-Island Company was excessive, and should be reduced to $12,500.

There remains for consideration the award of $8,000 to the Miller Salvage Company, Limited, which was, in our opinion, not only more excessive in amount, but the writer is of opinion, in view of the conduct of Capt. Miller, as disclosed by his own testimony, that the principles governing courts of admiralty preclude the making of any allowance to that company. He had charge of its operations, and was manager of the company, and the owner of a majority of its stock—members of his family owning almost all of the remainder. The actual value of the property used by his company in the salving operations appears from his own testimony to have been grossly exaggerated in making and seeking to maintain its salvage claim—so much so, indeed, that the trial court said in its opinion that "said values can be safely discounted to one-half and still be very liberal." That the court was quite moderate in this statement, so far as the boats are concerned, is abundantly shown by the evidence, from which it appears that the Mokolii was 30 years old and cost Miller $350, the Kaimiloa was 70 years old, the Elizabeth was a small launch, the Concord was more than 30 years old and cost Miller $850, and the James Makee was over 30 years old and cost him $4,500, although he testified that she was worth $15,000 because of improvements that he had made thereon, consisting mainly of a new windlass, which he testified he bought at auction from one Morgan for $500, and for which Morgan's books showed he paid $105 only.

By the anchor of the Miller Company as finally placed, the value of which anchor was fixed by the court at $12,000, that company undoubtedly rendered to the stranded ship valuable and meritorious service. Lightering done by it (contrary to Miller's own judgment and advice, but at the request of the master of the ship), while at first work-

ing harm, in that the direct tendency of it was to enable the current and swell to carry the ship further on the reef, ultimately was of benefit, for the reason, as is manifest from the evidence as well as from the findings, that the lightering, which, as has been seen, was also partly done by the Inter-Island Company, was an important element in the work of freeing the ship. I should, therefore, have no difficulty in holding that the Miller Company was entitled to a reasonable allowance for the services it rendered, but for the conduct of Capt. Miller now to be mentioned.

That the ship began to move about 8 o'clock in the evening of Wednesday, and made at least two "jumps" within a couple of hours, appears from the evidence without conflict; and that Capt. Miller was told at 10 o'clock that evening by the captain of his boat Concord that the ship was coming off also appears without conflict. Richard Clarke, one of Miller's men, testified that he noticed the first jump between 8 and 10 p. m., and that he told Capt. Miller that the ship was coming off, to which he responded, "Shut up." It appears that about that time Miller was in the cabin of the ship with the ship's master, the pilot, Capt. Macaulay, and Capt. Haglund of the Inter-Island Company, taking lunch. Capt. Miller testified, among other things, that about 8 o'clock Wednesday evening he instructed his men to keep a strain on the ship, and by invitation of her master went to his cabin to take some lunch, where were also the pilot, Capt. Macaulay, and Capt. Haglund of the Inter-Island Company. We extract from his testimony as follows:

"I went out on the deck every once in a while to see those men; then I'd go back in the cabin there with the pilot and the captain. Stayed there and ate lunch and telling stories. Finally, when I got out on deck one time I met one of the men. He said: 'The ship is starting. We're coming.' 'Slack on our lines,' I said, 'little, very little.' He said: 'You come here and look at the range.' I went there to see the range, and thought she was moved a little. So I told the boys to keep on heaving away, and I'd show them a trick or two before morning. We went back into the room. The pilot was telling us a good story, and she felt a jump, and the captain jumped up, and he said, 'Pilot, she's moving;' and he says: 'How the h—— can she move? They are not pulling. They won't start to pull until they get the signal.' * * * Capt. Henry said to him, 'Why, this man's men is pulling,' pointing to me. Macaulay said: 'Sit still, sit still. He's only tightening his tackles. He can't get her off.' So the captain sat down again. He jumped out of the chair, of the seat. About, I should say, anywhere from 10 to 20 minutes later on, I cannot say exactly the time, she made another jump. You could feel it then strong, and that time the pilot jumped, and Henry jumped up and started to run to the companionway. When they got up on deck, Macaulay went and looked over the stern, and he said, 'Bill, your anchor is dragged;' and he looked over the stern, and he said, 'The anchor isn't dragging; the ship's coming off'; look at the Arcona. See where she is!' and we'd shortened up the distance at least one-half, the probability is more. Then I said to him again, 'Look on your range lights;' and he looked at the range lights, 'and the order was given, 'Fire your fireworks, and up your second signal light.' And everybody was flying around there pretty busy, chopping lines and letting go hawsers. Before this, the man —I think it was Dick Clarke; I'm not sure—Dick Clarke, I saw him out on deck, and then the Kanakas were shouting, 'She's coming! she's coming! and I didn't want the captain or Pilot Macaulay to know that the ship was coming off. * * * Just before she had fetched the second bump, I'd run out in the meantime. I knew the ship was moving. I could hear the Kanakas plain. I was afraid that they would hear it. Q. How long before this time you rushed out did you tell these men to shut up? A. Oh, I had gone out between the two

bumps, after the first bump, when I got Macaulay and the captain quiet again, seated down telling stories again, and I had gone out in the meantime; then I come back; I'm frank to tell you I wanted them to stay down in the cabin. I wanted that ship to come off without their knowledge. * * * Q. Why did you want to keep the fact that you were pulling the Celtic Chief quiet from Capt. Henry and Pilot Macaulay? A. I'll tell you why. We'd started to work on that job in the morning, contrary to my own good judgment. In the first place, we had considerable difficulty in getting Capt. Henry to adopt the plan of putting an anchor down and the Helene. They had made an arrangement without—practically ignoring—me, and if the Celtic Chief came off or they had known that the Celtic Chief was being pulled off by the Miller Salvage Company's equipment, they would have given those signals to the German cruiser to begin pulling, and they would have shared in whatever glory and so far expense. We'd have to share in the credit of pulling her off. I wish your honor would permit me to say by way of interpolation that the German cruiser had absolutely no more to do with the actual pulling of that Celtic Chief than you."

At page 1385 of the transcript Miller testified that he knew of his own knowledge that the ship was coming off because he—

"saw the slack coming in a very little. I stayed there for a few minutes to assure myself to a dead certainty, and then went back to the cabin for fear them fellows would come out."

Further on in his testimony, in answer to the question, "Had you been out of the cabin during that time?" the witness answered:

"I came out between the two. I came out of that cabin at least a half a dozen times. I came out distinctly after the first bump. I came out to shut our men up. Q. You came up to shut up the first time? A. I had to come out and tell them between the bumps. I couldn't talk native, and I had to tell one of my men that spoke native to keep them fellows quiet."

Further on in his testimony Capt. Miller was questioned and answered as follows:

"Q. Now, you satisfied yourself that the Celtic Chief had come seaward several feet at that time, did you? A. Well, I satisfied myself she'd moved three or four feet. Q. At what time? A. At that time. Q. Did you go back and inform Capt. Henry and Capt. Macaulay and Capt. Haglund about that? A. Capt. Haglund was not there. Q. Did you inform Capt. Henry and Capt. Macaulay? A. No; I did not. Q. You didn't intend to? A. No; I didn't intend to. Q. You didn't want them to know anything about it? A. I did not. Q. And you went back down there and regaled yourself with lunch? A. I did. Q. And told stories back and forth? A. Yes. Q. In other words, it was your purpose to keep them in the dark about it? A. I didn't tell them that the ship was coming off. Q. You were trying to keep *that* from knowing? A. I wasn't holding them. Q. I am merely referring to the question to which you answered you did not tell them that the ship was coming off. A. If I stated that— I had no power to keep them quiet. I would'nt have told them, however. Q. Preferred not to have them know? A. I preferred not to have them know, because I told our men two or three times to shut up their noise. Q. Did you make that the first time? A. The first time I didn't tell the men at all of the fact that she was moving. Before the first bump those Kanakas knew as well as I knew it. Q. Now, didn't Dick Clarke come over to the cabin and call you out? A. He came out to the cabin door, and called me once. Q. Wasn't it just after that first bump that he came aft with —— ——? A. Possibly, it may have been. Q. And he told you that she was coming? A. Dick called me and told me she was coming."

On cross-examination Capt. Miller was further questioned and answered as follows:

"Q. Now, you said that you didn't go directly up on the deck when you heard this first bump because you wanted to wait until Capt. Henry and Capt.

Macaulay had allayed their suspicions somewhat, had been quieted down?  A. Practically so.  Q. That is to say, you mean by that that you didn't want them to get onto the fact that the Celtic Chief was actually afloat?  A. That's right. Q. And you stayed there and helped to make them quiet?  A. I stayed about 10 or 15 minutes.  Q. Even though you realized the Celtic Chief was coming off?  A. I knew she was coming off."

On cross-examination Capt. Miller was also questioned and answered as follows:

"Q. You had been down in the cabin for some little time with Capt. Henry and Capt. Macaulay?  A. Yes.  Q. Probably 10 or 15 minutes?  A. Yes; possibly.  Q. After having been up on the deck, on the main deck?  A. I think so. Q. And then you felt this bump, and Capt. Macaulay made the remark—  No, it was Capt. Henry made the remark—  A. No; Capt. Henry.  Capt. Macaulay was telling the story.  Q. And Capt. Henry made the remark that the ship must be coming off?  A. He said, 'The ship's coming off.'  Q. What did Capt. Macaulay say?  A. He said: 'Sit down! Why, how can it come off?  They're not towing.'  Capt. Henry said, 'This man's got his anchor out.'  Capt. Macaulay said: 'Oh, sit down!  Let me finish my story; she isn't coming off.'  Q. Did you say anything at all?  A. I think I said to him then—  He had said before, if Haglund had had any sense he would have sent him a bottle of beer to eat with that lunch.  Capt. Haglund had sent over a dish of sandwiches and pies.  I said to him, 'If you wait 10 or 15 minutes I'll put you alongside the Arcona and get some beer from them,' and Macaulay thought that was a good joke.  Q. Henry thought it was a good joke?  A. No; Henry was uneasy—he was rather uneasy, because he jumped out of his chair quick.  Q. Did you agree with Capt. Macaulay, or did you agree with Capt. Henry?  A. Oh, I agreed with Macaulay.  Q. What did you do that for?  A. Well, I didn't want them to know that she was coming off.  Q. So you were sure that she was coming off?  A. I didn't tell Henry that the ship was coming off.  I said, 'I'll put you alongside that German cruiser in 20 minutes.'  Q. In other words, you turned it into a sort of joke in telling them what you thought was the truth?  A. Exactly.  Q. In a jocular way?  A. Sure, I did.  Q. You did intend that they shouldn't know?  A. As far as I could.  Q. As far as you could, you gave that impression; you wanted to create that impression?  A. I did. *  *  *  Q. Well, then, isn't it the fact, Capt. Miller, that you were only out on deck once between the two bumps—that is, between the time you went out and told the men to shut up?  A. The best of my recollection is that between the two bumps I only recollect of going out on deck once.  Q. And that was the time you went out and told the men to shut up?  A. Yes; I told them to shut up then, but I may have told them before the first bump.  Q. What were you doing down there in that cabin during that period of time; that is, between the first and second bumps after you had come back into the cabin again? What were you doing at the time?  A. Telling stories and exchanging experiences.  Q. Didn't you feel pretty sure that there would probably be another movement of the Celtic Chief in a short time?  A. I did.  I expected to feel our side, our stern, bump right into the German cruiser.  Q. At any time?  A. That's what I did.  Q. Why weren't you out on the deck?  A. I didn't want to see it.  I wanted to feel it.  Q. I want to know why it was that you stayed down there in the cabin?  A. Because it suited me to do it.  Q. That was a pretty critical moment of the salvage of the Celtic Chief?  A. Sure it was.  Q. Still you deliberately stayed down in the cabin, feeling that that ship was going to come off at any time?  A. I did.  Q. What was your reason?  A. I didn't want them fellows on deck setting up any signal rockets.  Q. And you stayed down there in order to keep them from sending up the signals?  A. I don't know that my presence with them kept them, but it—  Q. That was your intention, at any rate?  A. That was my intention.  Q. Why didn't you want them—  A. For this reason, if those rockets and signals had gone up, the German cruiser would have started pulling right away, and she would then claim the credit for pulling that ship off."

The witness Miller was further questioned on cross-examination and answered as follows:

"Mr. Olson: I want to ask a question. You said that you hoped that the Celtic Chief would bump the Arcona? A. Yes. Q. One of the witnesses who has already testified on behalf of the Miller Salvage Company testified to a similar wish expressed by you? A. Yes. Q. Was that—did you—why was that spoken? A. I wasn't here in the court when he testified. I'm taking your word that he did. Q. But I say, on the ship, was that wish expressed on the Celtic Chief while she was coming off? A. It was expressed this way: I told those men: 'We'll show them a trick or two before we get through with them to-night.' I think I told the men myself that we'd bump her right in the stern. Q. And you hoped you would? A. I don't know that I said I hoped we would. I intended to do it. Q. You intended to? A. I did. Q. You wanted to bring her up near enough to bump? A. I wanted her to bump. Q. And in heaving on her then that was part of your intention? A. That was not part of my intention. Q. You knew that she was directly at stern, and you were so directing your appliances that she would bump her? A. That she would have bumped the Arcona, so there would have been no question about who pulled her off. That was my intention. That was in my mind. * * *

"Mr. Olson: I'll withdraw my question. At the time, Capt. Miller, did you stop to think that if the Celtic Chief did as you hoped she would, and intended that she would, namely, that the Arcona—that the Celtic Chief should bump the Arcona, that she would be damaged? A. I knew that she wouldn't suffer any material damage. Q. Did you stop to think that the Celtic Chief would probably suffer more damage than the Arcona? A. Sure, she would have suffered some damage. Q. I asked you a definite question. Would she have suffered more damage than the Arcona? A. I think she would. Q. Did you stop to think of that at the time? A. I didn't stop to consider that. Q. Now, then, the reason why—will you state the reason why you think she would have suffered the greater damage? A. Yes; because she was a lighter ship. Q. The Arcona was a steel vessel also? A. The Arcona was a steel vessel."

To reward a salvor who willfully suppresses facts that might be of benefit to a distressed vessel, and who willfully so conducts his operations as to endanger it for his own glorification or pecuniary benefit, would be contrary to the very first principles governing courts of admiralty. Such courts take pleasure in rewarding liberally those who gallantly rush into dangers to preserve the lives and property of others when exposed to the dangers of shipwreck, without considering the pecuniary or other benefit that may come to them, but will turn a deaf ear to all those whose misconduct was so gross as that of the Miller Salvage Company, Limited, in the present case. See The Boston, 3 Fed. Cas. 932; The D. M. Hall, 7 Fed. Cas. 770, 772; The Howard, 12 Fed. Cas. 630, 633; Pacific Mail S. S. Co. v. Commercial Pacific Cable Co., 173 Fed. 28, 97 C. C. A. 346; Abbott on Shipping (14th Ed.) p. 967; Jones, Salv. 124; Hughes, Admiralty, p. 139; Desty's Shipping and Admiralty, § 326; Carver's Carriage by Sea, § 346.

To the ratio of apportionment of the respective awards made by the court below between the libelants and their respective officers and men we see no objection. I think the cases should be remanded, with directions to the court below to modify the decree in accordance with the views above expressed, and, as so modified, should stand affirmed —the costs in this court to be apportioned two-thirds against the appellees, because of the large amount of unnecessary matter put into the record, and one-third against the appellant.

GILBERT, Circuit Judge, and WOLVERTON, District Judge (concurring). [3] We are unable to concur in the view that a salvage

award to the Miller Salvage Company should be denied for the reason that Miller withheld from the master of the Celtic Chief the information that the vessel was about to be rescued, or for the reason that Miller expressed the wish or purpose so to haul off the vessel as to cause her to bump the Arcona. It is not shown that Miller's suppression of facts in any way endangered the distressed vessel. Although on the Monday preceding there had been a hazy condition which indicated the approach of a kona, the weather on Tuesday and Wednesday was fine, with a light southerly wind. The other vessels were standing by awaiting the time of high tide, which was 1 a. m., when they expected to make a combined effort to pull the stranded vessel off. The sum and substance of the evidence is that Miller knew, perhaps two hours before the vessel came clear, that she had begun to move in response to the strain which his line was exerting, and that he said nothing about it. It does not appear that the vessel's movement could have been very materially hastened if others had known of it, and, if it be said that it was Miller's duty to relieve the anxiety of the master of the Celtic Chief, the answer is that the master might very readily have relieved his own anxiety by coming on deck and looking, instead of remaining as he did in the cabin, lunching and listening to the pilot's stories. Miller's conduct was evidently inspired by that feeling of rivalry which is often manifested, and is generally commendable, in the efforts of those who are striving together to accomplish a salvage service, and it was of the nature of that rivalry which the court refused to condemn in The Birdie, 7 Blatchf. 238, Fed. Cas. No. 1,432. In The D. M. Hall v. John Land, Fed. Cas. No. 3,939, Judge Hoffman held that slight misconduct of sailors, not resulting in any loss to claimants, should not reduce the amount of salvage.

As to Miller's wish to bump the Arcona, nothing was done in pursuance of it, and it resulted in nothing. It was a very human wish, for which Capt. Miller might perhaps have been pardoned, in view of the "half-heartedness" of the efforts of the Arcona's men, and their "gingerly" action in the fear of damage to their own vessel, which is observed in the opinion of the court below. Miller's attitude of mind toward the Arcona has been sufficiently penalized, we think, by the reduction which on that account the District Court made in the award to Miller's company.

We agree that the award to the Inter-Island Company should be reduced to $12,500, and we are of the opinion that the award to the Miller Salvage Company should be likewise reduced to the sum of $6,500. It is ordered that the decree of the court below be modified accordingly.